STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION, AND ROBERT MORGAN, ATTORNEY GENERAL, APPELLEES v. GENERAL TELEPHONE COMPANY OF THE SOUTHEAST, AND CITY OF DURHAM, APPELLANTS

No. 7110UC668

(Filed 17 November 1971)

1. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — original cost

In determining rates for a telephone company pursuant to G.S. 62-133(b), the reasonable original cost of the company's property is simply evidence to be considered by the Utilities Commission together with other evidence in determining the fair value of the property.

2. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — prices paid to affiliated company

In this telephone rate case, the Utilities Commission had authority to inquire into the reasonableness of the prices paid by the telephone company for its equipment and supplies purchased from an affiliated company, and, to the extent it found such prices unreasonable, to reduce the cost basis of the telephone company's intrastate telephone plant accordingly.

3. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — prices paid to affiliated company — reasonableness — return on common equity

Where the prices paid by a telephone company to an affiliated manufacturing company are the same as those which the manufacturing company charges other affiliated companies to which it makes a majority of its sales, the Utilities Commission could properly determine the reasonableness of the prices charged by the manufacturing company by comparing its rate of return on common equity with the rates of return experienced by other manufacturing companies operating in similar fields.

4. Telephone and Telegraph Companies § 1; Utilities Commission § 6— prices paid to affiliated company — reasonableness — prices paid by unaffiliated company

The fact that prices charged by a manufacturing company on its sales to an affiliated telephone company's North Carolina division were the same, or in some instances lower, than the prices which it charged an unaffiliated company in this State is not conclusive on the reasonableness of the prices charged to the affiliated telephone company.

5. Telephone and Telegraph Companies § 1; Utilities Commission § 6— prices paid to affiliated company — unreasonableness

The Utilities Commission did not err in determining that the prices paid by a telephone company to an affiliated company for equipment and supplies were unreasonably high to the extent requiring

a reduction of $978,000 in the cost basis of the telephone company's North Carolina telephone plant as of the end of the test period.

**6. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — excess margin in office equipment**

In this telephone rate case, the Utilities Commission erred in reducing the telephone company's investment in North Carolina telephone plant in the amount of $690,340 for "excess margin in central office equipment," where the equipment was in operation at the end of the test period, and nothing in the record suggests that the telephone company's management did not act in good faith in planning and building the additions to its equipment in anticipation of the future needs of the company.

**7. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — plant under construction**

In this telephone rate case, the Utilities Commission did not err in excluding from the cost of the telephone company's property the sum of $747,264 for plant under construction at the end of the test period. G.S. 62-133(c).

**8. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — fair value of property**

In this telephone rate case, the Utilities Commission's finding of the fair value of the telephone company's property by first determining original cost and then increasing that figure by 6% was unsupported by competent, material and substantial evidence in the record and was arrived at by a method which failed to comply with the directives contained in G.S. 62-133(b)(1).

**9. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — replacement cost**

The Utilities Commission must consider replacement cost in determining the fair value of a telephone company's property, the weight to be accorded to evidence of replacement cost being for the Commission to determine.

**10. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — quality of service — ambiguous finding of fact**

Finding by the Utilities Commission that "the overall quality of service afforded by the Applicant to its subscribers is on the low side of providing reasonably adequate service" is ambiguous in failing to show clearly whether the Commission found the utility's service to be reasonably adequate, but just barely so, or whether it found the utility's service to be slightly below being reasonably adequate.

**11. Telephone and Telegraph Companies § 1; Utilities Commission § 6— inadequate service — effect on rates — findings of fact**

If the Utilities Commission finds that the quality of a telephone company's service falls short of the statutory requirement that it be "adequate, efficient and reasonable," the Commission should also make specific findings showing the effect of any such inadequacy upon its

decision fixing rates which are "fair both to the public utility and to the consumer." G.S. 62-131(b).

**12. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — deficiencies in service**

Evidence of deficiencies in a telephone company's service was such as to provide "other material facts of record" which the Utilities Commission by statutory mandate was required to consider in making its determination as to what are just and reasonable rates for the quality of service which the telephone company is providing its customers. G.S. 62-133(d).

APPEAL by General Telephone Company of the Southeast and the City of Durham from order of the North Carolina Utilities Commission in Docket No. P-19, Sub 115 dated 11 May 1971.

On 14 July 1970 General Telephone Company of the Southeast (General, also sometimes referred to as Applicant) filed application with the North Carolina Utilities Commission (Commission) for adjustments of rates and charges for telephone service furnished by it in the State of North Carolina. General is a wholly-owned subsidiary of General Telephone and Electronics Corporation (GT&E) and is a public utility providing telephone service in North Carolina and five other southeastern states, furnishing local and long distance telephone service to its North Carolina customers through its Durham and Creedmoor exchanges. On 21 July 1970 the Commission entered an order declaring the proceeding to be a general rate case, suspending the effective date of the proposed rates, and setting the matter for hearing. On 7 August 1970 the City of Durham (City) filed application for leave to intervene, which was granted. In response to a letter from the Commission requesting greater details specifically on interstate-intrastate separations of investment, revenues and expenses, General filed an amended application on 11 August 1970, and on 18 January 1971 filed a supplemental application pursuant to Commission Rule R1-17(c) showing changes and conditions which had occurred subsequent to the filing of the amended application. On 22 January 1971 the Attorney General, pursuant to G.S. 62-20, filed notice of intervention on behalf of the using and consuming public.

In its amended application, General in summary (except where quoted) alleged: Its last general increase in rates took

effect on 1 February 1969. During the twelve months ending on 31 March 1970 its operating revenues from intrastate operations were $9,438,957.00, its intrastate operating expenses and taxes were $7,876,963.00, and with the addition of net miscellaneous income it had net income available for payment of interest costs and return to its equity holders of $1,649,261.00. Since 30 November 1967 it has increased its intrastate investment in telephone plant by over $13,000,000.00, for an increase of approximately 25%. Its net book cost of telephone plant used and useful in the rendition of intrastate telephone service in North Carolina was $33,467,015.00 on 31 March 1970. "Applying the net income available to Applicant for the twelve month period ending March 31, 1970, to a rate base consisting of net telephone plant investment plus material and supplies and cash working capital for a total of $34,531,781 results in a rate of return to Applicant of only 4.78 percent. Using net trended book cost, Applicant has a rate base of $43,480,850 and a resulting rate of return of 3.79 percent. Applicant says that such rate of return on its property does not produce a fair return for Applicant's stockholders, and does not allow the Applicant to compete in the market for capital funds on such terms as will enable Applicant to attract capital at a rate in the best interest of the customers and the stockholders of Applicant." Subsequent to the test period ending 31 March 1970 General made a public offering of $14,000,000.00 of its first mortgage bonds on 1 April 1970. In prior years such bonds had carried the equivalent of an A rating, but as a result of General's deteriorated financial position, its issue of bonds on 1 April 1970 was given a rating of only Baa, and General was required to market its bonds to the public at an annual cost to it of 9.60 percent, which was over 30 percent higher than its last previous bond issue. The total historic cost of General's long-term debt has been raised to an all time high of 6.37 percent. General is engaged in several programs of service improvement, which, together with customer growth, require it to market its bonds at frequent intervals to obtain capital. At its current level of return, General will be limited in the amount of capital it can raise by provisions of its indentures requiring net operating earnings equal to twice the interest costs on its debts. "To secure a reasonable rate of return on the fair value of its plant and property used and useful by Applicant in providing intrastate communication service in North Carolina," General proposed a schedule of

rates which would result in total annual revenue increase to it of $2,472,554.00.

Hearings were held in Raleigh on 2 February through 10 February 1971, at which witnesses presented by General, the Commission Staff, and the City were examined. On 11 February 1971 a day of public hearing was held in Durham, during which 50 customers testified to the poor quality of telephone service which they were receiving from General and expressed opposition to increased rates.

On 11 May 1971 the Commission entered its order, concurred in by three Commissioners, in which the Commission concluded that General's "overall level of service is on the low side of reasonably adequate service," required certain service improvements, and approved an increase in rates for General which the Commission concluded was sufficient to afford General an opportunity to earn approximately $1,445,003.00 additional annual gross revenues, being approximately 58.44 percent of the amount which had been requested by General. Commissioner Wells filed a dissenting opinion and Commissioner McDevitt filed an opinion dissenting in part and concurring in part. From this order General and the City of Durham appealed.

*Newsom, Graham, Strayhorn, Hedrick & Murray, by A. H. Graham, Jr.; and Power, Jones & Schneider, by John Robert Jones and William R. White for General Telephone Company of the Southeast, appellant.*

*City Attorney Claude V. Jones for City of Durham, appellant.*

*Attorney General Robert Morgan, by Assistant Attorney General Jean A. Benoy for the Using and Consuming Public, appellee.*

*Commission Attorney Edward B. Hipp, and Assistant Commission Attorney Maurice W. Horne for North Carolina Utilities Commission.*

PARKER, Judge.

The Commission having determined this to be a general rate case, the provisions of G.S. 62-133 became applicable and controlled the further proceedings in the case. Subsection (a) of G.S. 62-133 contains a general direction that in fixing rates

"the Commission shall fix such rates as shall be fair both to the public utility and to the consumer." Subsection (b) of G.S. 62-133 contains more specific directions as follows:

§ 62-133(b) "In fixing such rates, the Commission shall:

(1) Ascertain the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, considering the reasonable original cost of the property less that portion of the cost which has been consumed by previous use recovered by depreciation expense, the replacement cost of the property, and any other factors relevant to the present fair value of the property. Replacement cost may be determined by trending such reasonable depreciated cost to current cost levels, or by any other reasonable method.

(2) Estimate such public utility's revenue under the present and proposed rates.

(3) Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

(4) Fix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

(5) Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to paragraph (3) of this subsection the rate of return fixed pursuant to paragraph (4) on the fair value of the public utility's property ascertained pursuant to paragraph (1)."

It is apparent that the first step prescribed by G.S. 62-133(b)(1), that of ascertaining the "fair value of the public utility's property used and useful in providing the service ren-

dered to the public within this State," becomes of critical importance in the rate making process, for only after the determination of this "rate base" can judgment be intelligently exercised fixing the rate of return which the utility is entitled to receive on the fair value of its property and fixing rates to be charged by the utility which are "fair both to the public utility and to the consumer." It is not surprising, therefore, that the first four of the six questions argued in the brief of the appellant, General, on this appeal relate to errors which it contends were made by the Commission in the course of making its determination as to the fair value of General's property "used and useful in providing the service rendered to the public in this State." The first three of the questions presented relate to deductions made by the Commission from the original cost investment made by General in its telephone plant, and the fourth question relates to the method followed by the Commission in finally arriving at its determination of fair value after the deductions were made.

[1] Before discussing the several deductions which the Commission made from General's cost investment in its telephone plant to which General takes exception on this appeal, it may be well to emphasize that the establishment of "the reasonable original cost of the property," as referred to in G.S. 62-133(b)(1), is of significance only because "reasonable original cost" is one of several figures and factors which the statute requires the Commission to consider in arriving at "fair value." As stated by Lake, J., speaking for our Supreme Court in *Utilities Comm. v. Morgan, Attorney General,* 277 N.C. 255, 268, 177 S.E. 2d 405, 414:

> "There is but one rate base—the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, which value the Commission must determine as of the end of the test period. G.S. 62-133. *The original cost of the properties is simply evidence to be considered in making this determination. The replacement cost, whether determined by use of trended cost indices or otherwise, is also but evidence of the fair value of the properties.*" (Emphasis added.)

Although original cost is simply evidence to be considered by the Commission together with other evidence in determining fair value, it was evidence of such importance and had such

a major impact upon the Commission's ultimate finding as to fair value in this case that any substantial error in arriving at original cost would necessarily be of crucial significance. We therefore consider the merits of General's several assignments of error which are directed to the action of the Commission in making the deductions from original cost of its intrastate telephone plant which are brought forward in General's brief on this appeal.

General contends the Commission erred in deducting from its plant investment the sum of $978,000.00 which the Commission, in Finding of Fact No. 7, found was "in regard to the excess profits which are reasonably attributed to its major supplier, Automatic Electric Company." Automatic Electric Company (AE), as is General, is a wholly-owned subsidiary of GT&E and is the major manufacturing and supply company for GT&E affiliated companies and for other non-Bell System telephone companies. Exhibits and testimony presented by the Commission Staff showed that during the period from 1957 through 1969 annual sales from AE to GT&E affiliated companies, including General, increased from approximately $87 million in 1957, which was 52.6% of AE's total sales for that year, to more than $418 million in 1969, which was 74% of AE's total sales for that year. During recent years General's North Carolina division has purchased approximately 85 to 90 percent of its equipment and supplies from AE, and during the twelve-month test period which ended on 31 March 1970, General's North Carolina division purchased 94.2% of its equipment and supplies from AE. Because of the close relationship between General and AE, because of the substantial percentage of its total equipment and supplies which General purchases from AE, and because of the dominant position occupied by AE as the leading manufacturer and supplier of telephone equipment to non-Bell System companies, the Commission, in the order appealed from, concluded that it was "reasonable to deal with Automatic Electric Company and the Applicant for rate making purposes as one company subject to regulation by this Commission." The Commission further concluded that it was "reasonable to subject AE to the same rates of return on common equity as are similar-type non-regulated companies," and that prices charged by AE to General were "unreasonable and excessive to the extent they produce a return higher than 15% on common equity." On the

basis of these conclusions the Commission reduced the cost of General's North Carolina telephone plant by $978,000.00, which amount it found to be "excess profits which are reasonably attributed to its dealings with its major supplier, Automatic Electric Company."

[2, 3] Without finding it necessary to pass on the correctness of the Commission's conclusion that AE and General should be dealt with "for rate making purposes as one company subject to regulation by this Commission," we hold that the Commission had ample authority to inquire into the reasonableness of the prices paid by General for its equipment and supplies purchased from General, and, to the extent it found such prices unreasonable, to reduce the cost basis of General's intrastate telephone plant accordingly. G.S. 62-133 (b) (1) directs the Commission, in the process of ascertaining the fair value of a public utility's property, to consider, among other things, "the *reasonable* original cost of the property." (Emphasis added.) Where the property has been purchased from a stranger, ordinarily the price actually paid by the utility would be considered its reasonable cost, though it would not necessarily be so. Even in such a case the Commission may find that the management of the utility acted improvidently or carelessly and paid a price greater than reasonable. In cases such as the one now before us, in which a substantial portion of the utility's property was acquired by purchase from an affiliated company, it becomes obligatory upon the Commission to scrutinize the prices paid and, to the extent it finds such prices unreasonable, to make adjustments in the utility's figures accordingly. This is all the more true where, as here, the affiliated supplier so dominates the market that its pricing policies may not be sufficiently controlled by normal competition. The question, of course, is not so much whether the affiliated manufacturing company is earning "excess profits" on its overall operations, most of which involve transactions outside of North Carolina, as it is whether the prices which it charges the affiliated utility company in North Carolina are reasonable. Where such prices are the same as it charges other affiliated companies to which it makes a majority of its total sales, one method of determining the reasonableness of its prices is to compare its rate of return on common equity with the rates of return experienced by other manufacturing companies operating in similar fields. Essentially this was the method followed by the Commission in the present case, and in this we find no error.

[4, 5]   The fact that the prices charged by AE on its sales to General's North Carolina division were the same, or in some instances lower, than prices which it charged Carolina Telephone and Telegraph Company (Carolina), an unaffiliated telephone company in North Carolina, is not, in our opinion, conclusive of the reasonableness of the prices charged to General. The Commission might reasonably find in a case involving Carolina that the prices paid by it were reasonable, since Carolina's management, dealing at arm's length with AE as the dominant supplier in the field, might have insufficient bargaining power to obtain better prices. At the same time the Commission could, in our opinion, also reasonably find these same prices, when paid by General to AE, to be unreasonable. In the one case (sales by AE to Carolina) AE's pricing may reflect some degree of exploitation of its dominant position in the market; in the other case (sales by AE to General) AE's prices are fixed in transactions between two companies, both of which are wholly owned and wholly controlled by the same parent; in neither case do normal competitive factors exert much influence. We find no error in the Commission's action in examining into the reasonableness of the prices paid by General to AE nor in the method which the Commission used in making its determination that such prices were unreasonably high to the extent requiring a reduction of $978,000.00 in the cost basis of General's North Carolina telephone plant as of the end of the test period on 31 March 1970.

[6]   The Commission also reduced General's investment in its North Carolina telephone plant in the amount of $690,340.00 for "excess margin in central office equipment in relation to the test period." In this we find error. A public utility has an obligation to furnish reasonably adequate service to the public within the limits of its franchise. It does not fulfill this obligation simply by meeting present needs; its management must attempt to anticipate future needs. This necessarily involves the exercise of judgment and discretion in forecasting future rates of growth in the demand for the utility's services and in making decisions concerning how best to meet those anticipated future demands. Difficult advance planning must be undertaken involving intricate financial, engineering, personnel, and business problems. All of these problems must be solved and the solutions coordinated sufficiently in advance to permit completion of additions to the utility's facilities and plant required to meet the future

growth in demand as that demand develops. And all of this must be done while conditions are continuously and rapidly changing. For engineering and financial reasons, among others, it is only prudent that some types of facilities, among them the central office equipment of a telephone company, should be so designed as to provide capacity in excess of that required when it is first put into service. It is for the management of the utility, not for the Commission or the Courts, to do the difficult advance planning and to solve the intricate problems involved in expansion of the utility's facilities. Nor do we think it proper for the Commission or the Courts, by exercising the wisdom granted them by hindsight, to second-guess the utility's management when it acted in apparent good faith. Nothing in the record before us suggests that General's management did not act in perfect good faith in planning and building the additions to its central office equipment. While that equipment might have provided at the end of the test period capacity in excess of the amount needed at that moment, no question has been raised that it was not in operation at that time, and in our opinion, it was at that time property both "used and useful" by the utility in providing services to the public within this State. This being so, the Commission had no authority to deduct any portion of its costs in arriving at the "reasonable original cost of the property" for consideration by it in making its ultimate determination of fair value.

[7]    The Commission also excluded from the cost of General's property the sum of $747,264.00 for plant under construction at the end of the test period on 31 March 1970. In this we find no error. Subsection (c) of G.S. 62-133 is as follows:

> "(c) The public utility's property and its fair value *shall be determined as of the end of the test period used in the hearing* and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time." (Emphasis added.)

This statute is controlling. "Until it is changed by the Legislature, both the Commission and this Court must follow the statute as presently written." *Utilities Comm. v. Morgan, Attorney General*, 278 N.C. 235, 179 S.E. 2d 419.

[8]    The fourth question presented by the brief of the appellant, General, on this appeal relates to the method followed by the

Commission in finally arriving at its determination of the fair value of General's telephone plant after it had made the deductions discussed above from the original cost of the plant. In its order, under the heading of "Conclusions," the Commission referred to the method which it utilized in reaching its determination "in regard to Applicant's net investment in plant," referred to the deductions already discussed, and finally arrived at a figure for "Net Investment Plus w/c Adjusted" of $30,107,171.00. (This figure included an allowance for working capital, being materials, supplies, and one month's cash requirements less Federal Income Tax accruals, in the sum of $563,308.00.) In its order the Commission made no finding of fact or conclusion as to the replacement cost of General's telephone plant, which is one of the matters along with "reasonable original cost," and "any other factors relevant," which G.S. 62-133 (b) (1) directs it to consider in ascertaining fair value. It did, however, make a reference in the order to the testimony of Applicant's witness, McGrath, to the effect that during the week of 27 April 1970 he had made a visual inspection of Applicant's plant and equipment and had examined Applicant's books and records in order to arrive at what the witness believed was the replacement cost of Applicant's plant, properties and equipment. The Commission in its order simply noted that the witness, McGrath, testified that "the net trended book cost of plant of the Applicant as of the end of the test period was, in his opinion $49,409,698," and also referred to an exhibit introduced by the Applicant which showed the net trended book cost of the North Carolina intrastate portion of Applicant's plant on that date as $40,781,543.00. No further reference was made in the order to replacement cost except the passing reference in Finding of Fact No. 9, which is as follows:

> "(9) The Commission finds that the fair value of the Applicant's properties used and useful in rendering intrastate telephone service to its North Carolina subscribers, considering original cost less depreciation and considering replacement cost by trending original cost by current cost levels, is $31,913,601."

The order does not reveal how the Commission arrived at the figure of $31,913,601.00 as the fair value of General's properties except the statement in Finding of Fact 9 that it was arrived at "considering original cost less depreciation and con-

sidering replacement cost by trending original cost by current cost levels." We note, however, that as pointed out in General's brief, the fair value figure of $31,913,601.00 found by the Commission is exactly 106% of $30,107,171.00, which latter figure was the Commission's conclusion, as noted above, of General's "Net Investment Plus w/c Adjusted." It is apparent, therefore, that the Commission arrived at its ultimate determination as to the fair value of General's property by first determining original cost and then increasing that figure by 6%. Nothing in G.S. 62-133 supports this method of ascertaining fair value. Even if it did, nothing in the record supports the application of a 6% or any other percentage increment. Despite the Commission's statement in Finding of Fact 9 that it considered replacement cost, it is apparent that it did not do so, unless it assumed *sub silentio* that by increasing original cost exactly 6% it was adequately "considering" replacement cost. Such an assumption hardly seems justified in view of the fact that the only evidence in the record as to replacement cost yielded a figure of $40,781,543.00, which was approximately 35% higher than the Commission's determination as to original cost. We can only conclude, therefore, that the Commission's finding of fair value in this case was not supported by competent, material and substantial evidence in the record and was arrived at by a method which failed to comply with the directives contained in G.S. 62-133(b)(1).

[9] It was, of course, for the Commission to determine what weight to give to the evidence in the record as to replacement cost. "In these times of increased construction costs and decreased dollar value, trended cost evidence deserves weight in proportion to the accuracy of the tests and their intelligent application." *Utilities Commission v. Gas Co.*, 254 N.C. 536, 550, 119 S.E. 2d 469, 479. The Commission's order in the case before us is silent as to what weight, if any, it gave to the evidence as to replacement cost, since it made no findings in this regard. It was, however, the duty of the Commission to weigh such evidence "fairly in balanced scales," *Utilities Commission v. Gas Co., supra,* and on the present record it does not appear that this was done.

[10-12] By statutory command, G.S. 62-131(b), "[e]very public utility shall furnish adequate, efficient and reasonable service." In the present case there was extensive testimony from

General's customers concerning deficiencies in its service. The Commission's Finding of Fact No. 14 contains the following:

> "The Commission finds that the overall quality of service afforded by the Applicant to its subscribers is on the low side of providing reasonably adequate service. The following specific service improvements are determined to be necessarily required to be completed on or before July 1, 1972:" (There then follows a list of eleven specific types of service improvements.)

The language employed by the Commission is ambiguous, and we cannot clearly determine whether the Commission's finding means that it found General's service to be reasonably adequate, but just barely so, or whether it found General's service to be slightly below being reasonably adequate. If the Commission's finding means that it found the quality of General's service to fall short of the statutory requirement that it be "adequate, efficient and reasonable," then the Commission should make specific findings showing the effect of any such inadequacy upon its decision fixing rates which are "fair both to the public utility and to the consumer." Subsection (d) of G.S. 62-133 directs that "[t]he Commission *shall* consider all other material facts of record that will enable it to determine what are reasonable and just rates." (Emphasis added.) Certainly the evidence of service deficiencies in the present record was such as to provide "other material facts of record" which the Commission by statutory mandate was required to consider in making its determination as to what are just and reasonable rates for the quality of service which the Applicant utility is providing its customers in the present case. As stated by Justice Lake, speaking for our Supreme Court in *Utilities Comm. v. Morgan, Attorney General,* 277 N.C. 255, 267, 177 S.E. 2d 405, 413:

> "The ultimate question for determination is, What is a reasonable rate to be charged by the particular utility company for the service it proposes to render in the immediate future? The determination of this question is for the Commission, in accordance with the direction of G.S. 62-133. Serious inadequacy of such service found by the Commission upon substantial evidence, is one of the facts which the Commission is required by that statute to take into account in making that determination."

Specific and unambiguous factual findings by the Commission are necessary to enable a reviewing court to determine whether the duty imposed by statute has been performed.

General also contends that the rate of return of 7.53% fixed by the Commission upon its finding of fair value of General's property was arbitrary and capricious and was insufficient to produce a fair profit for its stockholder. In view of the fact that the appropriate rate of return can only be determined after the fair value of the utility's property is correctly ascertained, and in view of our decision that this case should be remanded to the Commission for further consideration and fixing of fair value in accordance with the principles set forth above, we do not on this appeal pass upon the merits of General's contentions that the Commission committed error in fixing a rate of return of 7.53%.

We have examined the remaining assignments of error brought forward in the briefs of both appellants, General and the City of Durham, and find in them no prejudicial error.

The order of the Utilities Commission is reversed and this matter is remanded to the Utilities Commission for further consideration in accordance with the principles set forth in this opinion, such further consideration by the Commission to be either upon the present record or after such further hearing as the Commission shall deem proper.

Reversed and remanded.

Judges BRITT and MORRIS concur.