STATE OF NORTH CAROLINA, EX REL, UTILITIES COMMISSION, ROBERT MORGAN, ATTORNEY GENERAL, NORTH CAROLINA CONSUMERS COUNCIL, INC., NORTH CAROLINA ASSOCIATION OF BROADCASTERS, CONTACT, INC., AND THE SECRETARY OF DEFENSE OF THE UNITED STATES, APPELLEE, v. SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, APPELLANT

No. 7410UC775

(Filed 2 January 1975)

1. Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rates — rate of return — failure to find cost of capital and equity

The Utilities Commission sufficiently set forth its reasons for adopting a rate of return on fair value of 7.55% for a telephone company, and the Commission did not err in failing to make findings of fact as to the cost of capital to the telephone company and the cost of, or reasonable return on, either book or fair value equity.

2. Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rates — adjusted amount for materials and supplies

The Utilities Commission did not err in adopting an adjusted figure for materials and supplies used and useful in providing telephone service that was less than the telephone company's actual investment in materials and supplies during the test period.

3. Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rates — error in cash component of working capital

Error by the Utilities Commission in determining the cash component of a telephone company's working capital was not prejudicial where the error deprived the company of only $31,265 and the Commission allowed an increase in rates that would produce in excess of $8 million in additional income.

4. Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rates — allocation of interest expense incurred by parent corporation

The Utilities Commission did not err in allocating to a telephone company a portion of interest expense incurred by its parent company, with whom it files a consolidated income tax return, in obtaining funds by debt issues to purchase common stock of the parent's wholly-owned subsidiaries, and treating the allocated interest expense as a tax deduction for the telephone company, thus reducing the tax expense of the telephone company.

5. Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rates — annualization adjustment factor

The Utilities Commission did not err in adopting an annualization adjustment factor of 3.61% for a telephone company based on total telephones in service, including extensions.

6. **Telephone and Telegraph Companies § 1; Utilities Commission §·6—telephone rates — disallowance of charitable contributions**

    The Utilities Commission did not err in disallowing charitable contributions as an expense in determining a telephone company's reasonable operating expenses.

7. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—telephone rates — order more than 270 days after proposed rates suspended**

    Utilities Commission order in a telephone rate case was not invalid for the reason that it was entered, or that the rates provided therein became effective, more than 270 days after the proposed rates were suspended. G.S. 62-134.

    Judge MORRIS dissenting.

APPEAL by applicant, Southern Bell Telephone and Telegraph Company, from order of North Carolina Utilities Commission entered 30 April 1974.

This proceeding was instituted on 20 June 1973 when Southern Bell Telephone and Telegraph Company (Southern Bell) filed an application with the North Carolina Utilities Commission (Commission) asking for authority to increase existing rates and charges for intrastate service to produce an annual increase in revenue of approximately $33,812,129. By order dated 20 July 1973, the Commission declared the application to be a general rate case, suspended the proposed increase in rates, and set the matter for hearing to begin 27 November 1973 after due notice to the public.

Pursuant to petitions duly filed, the Commission allowed the following to intervene: The Department of Defense and all other Executive Agencies of the United States; the North Carolina Consumers Council; the North Carolina Association of Broadcasters, Inc.; Contact, Inc.; and the Attorney General of North Carolina, on behalf of the using and consuming public.

Following a much used procedure to test a utility's level of earnings and thus the reasonableness of its existing rate structure, the Commission selected a test period for the 12 months ending 30 June 1973. The Commission required Southern Bell to revise the exhibits filed with its application to show its financial experience for that 12 months' period.

Hearings were held for some seven or eight days in late November and early December of 1973. Witnesses were presented by Southern Bell, the Commission, and various protest-

ants, including the Attorney General. On 30 April 1974, the Commission filed its order which included the following findings of fact:

(1) The total increases in rates and charges as filed by Southern Bell would produce $34,412,771 in additional gross annual revenues, and the total reductions filed would amount to $600,642 in annual reductions, leaving the combined additional increase in annual revenues applied for of $33,812,129, or resulting in total annual intrastate operating revenues of $236,660,582.

(2) The reasonable original cost of Southern Bell's North Carolina intrastate utility property is $606,237,216, the depreciation reserve is $126,706,712, thereby making the depreciated original cost $479,530,504.

(3) The reasonable replacement cost of Southern Bell's intrastate plant in service is $623,640,532, plus a working capital, material and supplies allowance in the amount of $2,205,994, producing a total reasonable replacement cost of $625,846,526.

(4) The allowance for working capital under approved rates after accounting and pro forma adjustments at June 30, 1973, of $2,205,994 is proper.

(5) The fair value of Southern Bell's property used and useful in providing service to the public within North Carolina at the end of the test period considering the depreciated original cost, and the working capital allowance of $481,736,498 and the reasonable replacement cost of $625,846,526, is $549,691,301.

(6) The approximate gross revenues for Southern Bell for the test period were $203,001,960 under present rates, and under proposed rates would have been $236,841,089, before annualization to year end revenues.

(7) The level of operating expenses after accounting and pro forma adjustments, including taxes and interest on customer deposits, is $166,581,787, which includes an amount of $29,284,759 for actual investment currently consumed through reasonable actual depreciation, before annualization to year end level.

(8) The proper annualization factor necessary to restate income after accounting and pro forma adjustments to end-of-period level as required by G.S. 62-133 is 3.61%.

(9) The proper rate of return which Southern Bell should have the opportunity to earn on the fair value of its North Carolina intrastate investment is 7.55%.

Although the test period ended on 30 June 1973, in making its final determinations the Commission took into consideration an increase in ways for Southern Bell employees which went into effect on 1 July 1973.

In its order, the Commission allowed an increase in rates that would produce approximately $8,271,000 in additional annual income, approximately 25 percent of that requested, the increase to become effective on 15 May 1974. Southern Bell appealed.

*Attorney General James H. Carson, Jr., by Deputy Attorney General I. Beverly Lake, Jr., and Associate Attorney Robert P. Gruber, for plaintiff appellee.*

*North Carolina Utilities Commission by Commission Attorney Edward B. Hipp, Assistant Commission Attorney Maurice W. Horne, and, Associate Commission Attorney Lee W. Movius, for plaintiff appellee.*

*Joyner & Howison, by R. C. Howison, Jr., John F. Beasley, R. Frost Branon, Jr., Drury B. Thompson, and Harvey L. Cosper, for defendant appellant.*

BRITT, Judge.

This being a general rate case, it is controlled for the most part by G.S. 62-133 which provides how rates are fixed, and by G.S. 62-79 which provides what the final order of the Commission shall contain. Due to the large number of general rate cases that have found their way to our appellate division in recent years, much has been written on the subject of rate making and the respective functions of the Commission and the courts in that important process.

An extensive discussion of legal principles applicable to establishing rates for telephone companies is set forth in an opinion by Justice Lake in *Utilities Commission v. General Telephone Company,* 281 N.C. 318, 189 S.E. 2d 705 (1972) which, with minor modification, affirmed a well considered opinion by Judge Parker reported in 12 N.C. App. 598, 184 S.E. 2d 526 (1971). While no useful purpose would be served by stating again all of the principles set forth in the General Telephone

Company opinions, we think a restatement of the following principles, gleaned from those opinions and pertinent to this case, would be appropriate:

(1) The Utilities Commission, not the Supreme Court or the Court of Appeals, has been given the authority to determine the adequacy of a public utility's service and the rates to be charged therefor. G.S. 62-31; G.S. 62-32; G.S. 62-130; G.S. 62-131.

(2) The authority of an appellate court to reverse or modify an order of the Utilities Commission, or to remand the matter to the Commission for further proceedings, is limited to that specified in G.S. 62-94, which includes the authority to reverse or modify such order on the ground that it violates a constitutional provision.

(3) Upon appeal, the rates fixed by the Utilities Commission, pursuant to G.S. Chapter 62, are deemed *prima facie* just and reasonable, and all findings of fact supported by competent, material and substantial evidence are conclusive.

(4) A finding of fact or determination of what rates are reasonable by the Utilities Commission may not be reversed or modified by the reviewing court merely because the court would have reached a different finding or determination upon the evidence.

(5) The burden of proof is upon the utility seeking a rate increase to show the proposed rates are just and reasonable. G.S. 62-75; G.S. 62-134 (c).

By its assignments of error, Southern Bell contends the Commission erred in the following respects: (1) in setting the rate of return at 7.55% ; (2) in determining Southern Bell's rate base; and (3) in delaying too long the issuance of its order. We will discuss the assignments in the categories indicated.

### SETTING THE RATE OF RETURN

[1]　Southern Bell argues that the Commission did not sufficiently set out the reasons for adopting a rate of 7.55% ; that the Commission should have made factual findings as to the cost of capital to Southern Bell, and the cost of, or a reasonable return on, either book or fair value equity to Southern Bell. We reject this argument.

G.S. 62-133 (b) (1) requires the Commission to ascertain the fair value of a public utility's property " . . . used and useful in providing the service rendered to the public within this State, considering the reasonable original cost of the property less that portion of the cost which has been consumed by previous use recovered by depreciation expense, the replacement cost of the property, and any other factors relevant to the present fair value of the property. Replacement cost may be determined by trending such reasonable depreciated cost to current cost levels, or by any other reasonable method." The Commission ascertained fair value to be $549,691,301 and that determination is fully supported by the record. The statute, G.S. 62-133 (b) (4), then provides that the Commission shall "[f]ix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reaesonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors."

Two of the key witnesses at the hearing before the Commission were Mr. Dean, an expert witness presented by Southern Bell, and Mr. Kosh, an expert witness presented by the Attorney General. In arriving at their opinions as to a fair rate of return, Mr. Dean used the "comparable earnings" test and Mr. Kosh used what he referred to as the "discounted cash flow" approach. Mr. Dean compared Southern Bell's financial structure, earnings, etc., with certain other utilities, regulated and unregulated, and certain high grade industrials. Mr. Kosh used a different approach, providing an analysis of the entire Bell System of which Southern Bell is a part, and stressed the favored position of a regulated utility as contrasted with industrials in a highly competitive market. Based on his studies, Mr. Kosh concluded that 7.8% was the maximum return that would be reasonable for Southern Bell to have an opportunity to earn on its fair value rate base.

In its order the Commission devoted some 18 pages in reviewing and analyzing testimony and pertinent statutes and court decisions relating to its finding of fair value. We find no authority that requires the Commission to make the factual

Utilities Comm. v. Telegraph Co.

findings that Southern Bell contends it should have made. The statutes list what the Commission shall "ascertain" or "determine," but the items in question are not so listed. The Commission relied heavily on Mr. Kosh's testimony and he appears to have followed the principle that to attract capital, a public utility need not charge, and is not entitled to charge, for its services rates which will make its stock or bonds attractive to investors who are willing to risk substantial loss of principal in return for the possibility of abnormally high earnings, since the utility, having a legal monopoly in an essential service, offers its investors a minimal risk of loss of principal. This principle was restated with approval in the General Telephone case, *supra*.

Southern Bell further argues that the effect of Mr. Kosh's testimony was to recommend a 7.8% return, therefore, there was no evidence to support the Commission's finding of 7.55%. We construe Mr. Kosh's testimony to say that 7.8% was the *maximum* return that would be reasonable for Southern Bell. Furthermore, it is the prerogative of the Commission to determine the credibility of evidence before it, even though such evidence be uncontradicted by another witness. *Utility Commission v. Power Company,* 285 N.C. 377, 206 S.E. 2d 269 (1974).

We hold that the assignments of error with respect to fixing the rate of return are without merit.

DETERMINING THE RATE BASE

Southern Bell contends the Commission erred in understating Southern Bell's rate base by certain exclusions for materials and supplies and cash working capital; by overstating revenues and understating expenses by improperly allocating AT&T interest expense, by erroneously utilizing an improper annualization adjustment factor, and by disallowing charitable contributions as an expense.

Under this contention, Southern Bell argues that the Commission wrongfully calculated the fair value of its properties by adopting an incorrect figure for materials and supplies, and erroneously calculating the proper amount for the cash component of working capital.

[2] With respect to materials and supplies, Southern Bell's witness Turner testified that the intrastate portion of Southern Bell's investment in materials and supplies as of 30 June 1973 was $4,563,388. Witness Carter, of the Commission's staff, testified that this figure should be adjusted downward by $1,091,058

and the Commission adopted the adjustment. The effect of this adjustment was to reduce by the latter amount the fair value of Southern Bell's property "used and useful" in providing service to the people of North Carolina. The methodology used by Mr. Turner was the same as that approved by this court, speaking through Judge Parker, in *Utilities Commission v. Telephone Company*, 15 N.C. App. 41, 189 S.E. 2d 777 (1972), and no useful purpose would be served in restating the methodology here. Suffice it to say, we adhere to our former opinion.

[3] With respect to the amount adopted by the Commission as a cash component of working capital, the Commission admits that it made an error but denies that the error was sufficiently prejudicial to require reversal of the order appealed from. We agree with the Commission.

The error resulted in a $414,111 understatement of working capital, which in turn caused an identical understatement of the fair value of Southern Bell's property used and useful. Multiplying the $414,111 by the 7.55% rate of return on fair value allowed by the Commission, Southern Bell was deprived of approximately $31,265, which amount should have been added to return on common equity. This represented only .00126% of the $24,746,737 allotted to Southern Bell's common equity under the approved rates.

In the Supreme Court opinion in the General Telephone case, *supra*, Justice Lake said (page 370) : " . . . At best, the result of the complex rate making procedure is an approximation of this objective (fixing a fair rate of return on fair value)." We hold that the admitted error was not sufficiently prejudicial to disturb the order.

[4] We think the Commission properly allocated to Southern Bell certain interest expense incurred by its parent, American Telephone and Telegraph Company. The statute requires that the Commission ascertain the utility's annual "reasonable operating expenses," G.S. 62-133(b) (3), and, clearly, taxes constitute an operating expense item. Since interest is a deduction from taxable income, the Commission must determine a utility's annual interest payments. This determination was made difficult in the instant case for the reason that Southern Bell files no tax return of its own, but files a consolidated return with AT&T. Therefore, the Commission allocated to Southern Bell a portion of certain interest expense incurred by AT&T, which expense was generated by debt issues by AT&T to obtain funds

with which to purchase common stock issues of its wholly owned subsidiaries, including Southern Bell. The tax savings accrues when the interest paid by AT&T on its debt securities is deducted from gross income on the consolidated tax return filed by AT&T and its subsidiaries. For purposes of rate making, the Commission treated the allocated interest expense as a tax deduction and, accordingly, lowered Southern Bell's tax expense. The result of this procedure was a $3,617,998 adjustment to Southern Bell's North Carolina intrastate interest expense, and a concomitant $1,785,080 adjustment to Southern Bell's state and federal income taxes. We hold that the procedure was proper.

[5]   Southern Bell argues that the Commission erred in adopting an annualization adjustment factor of 3.61%. As a part of the rate fixing process, the statute requires that the Commission estimate the utility's revenue under present and proposed rates, and that probable future revenues and expenses shall be based on the plant and equipment in operation as of the end of the test period. G.S. 62-133(b)(2) and (c). The adjustment factor is referred to also as a growth factor. At the hearing, Southern Bell's witness Turner testified that this factor should be 2.6% and based his conclusion on the number of main and equivalent stations in service. Commission staff witness Carter opined that this factor should be 3.61% and based his conclusion on total telephones in service, including extensions. Southern Bell argues that revenue derived from extensions is much less than that derived from main stations. We hold that the factor adopted by the Commission is supported by the evidence.

[6]   Southern Bell argues that the Commission erred in disallowing as expense certain charitable contributions. The record reveals that in ascertaining Southern Bell's operating expenses, the Commission disallowed $180,000 in contributions. The Commission reasoned that to include this item as an expense would have the effect of requiring ratepayers to make involuntary contributions through the payment of rates to an organization or organizations of Southern Bell's choice. We hold that the disallowance of the contributions item was a proper exercise of the Commission's discretion in determining Southern Bell's *reasonable* operating expenses.

## DELAYING ISSUANCE OF ORDER

[7]   Southern Bell contends that the order appealed from is invalid for the reason that under G.S. 62-134 the Commission

may suspend proposed rates for a maximum of 270 days; that if the rates proposed by Southern Bell in this proceeding had not been suspended by the Commission, they would have gone into effect on 31 July 1973; that the Commission's order granting part of the requested increase in rates was entered on 30 April 1974, 273 days after 31 July 1973, and it made the new rates effective 15 May 1974. Admitting that the order was not entered within the 270 days, appellees argue that Southern Bell could have put its requested rates into effect for the period from 27 April 1974 to 15 May 1974 but voluntarily chose not to do so.

G.S. 62-134 (b) clearly gave the Commission authority to suspend the proposed rates for a maximum of 270 days. The statute further provided that if the proceeding with respect to the proposed increases had not been concluded, and an order made within the period of suspension, the proposed change of rates would go into effect at the end of such period. But the statute further provided that after hearing, whether completed before or after the proposed rates went into effect, the Commission could make such order with respect thereto as would be proper in a proceeding instituted after the rates had become effective.

We hold that the order appealed from is not invalid for the reason that it was entered, or that the rates provided therein became effective, more than 270 days after the proposed rates were suspended.

*    *    *

For the reasons stated, the order appealed from is

Affirmed.

Judge HEDRICK concurs.

Judge MORRIS dissents.

Judge MORRIS dissenting.

By G.S. 62-133 (b) (4) the Commission is directed to "[f]ix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, *considering changing economic conditions* and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its fran-

chise, *and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.*" (Emphasis supplied.)

In *Utilities Commission v. Power Co.*, 285 N.C. 377, 393, 206 S.E. 2d 269 (1974), Justice Lake, speaking for the Court, said:

> "Since the decision of the Supreme Court of the United States in *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176, it has been accepted that a 'fair rate of return' is one sufficient to enable the utility to attract, on reasonable terms, capital necessary to enable it to render adequate service. This is the test laid down by G.S. 62-133 (b) (4)."

The Commission in its order, speaking of "fair rate of return" said:

> "Evidence as to what is a fair and reasonable rate of return is often conflicting and by its very nature lacks complete objectivity. We have carefully considered the criteria laid down in the Bluefield and Hope cases and have applied our informed judgment based upon all of the evidence to reach the necessary conclusions. We have weighed all the factors considered by the witnesses testifying in this proceeding and we have discussed certain points we felt appropriate heretofore in this Order.
>
> The Commission has given serious consideration to all of the relevant evidence presented in this case, concerning the cost of capital, in view of the company's need for a competitive position in the capital market in order to pursue the programs of expansion which will provide both additional and improved service to the ratepayers. Based on the foregoing and the entire record in this matter, and applying its informed judgment, the Commission finds that fair rate of return of 7.55% is fair and reasonable for this company to earn on its fair value rate base. . . . "

If cost of capital must be considered in arriving at a fair rate of return, there must be evidence offered thereon. It is obvious that consideration of these factors generate conflicting opinions. This is particularly true with respect to costs of and return on equity capital. For example, the Company witness Dean testified that in determining the overall cost of capital

to Southern Bell, he used cost of equity of 12½%. Mr. Kosh, witness for the Attorney General, however, testified that he found the cost of equity for Southern Bell to be no more than 9.5%.

I am of the opinion that as to cost of capital, it is not sufficient for the Commission to state that it has considered "all of the relevant evidence presented in the case, concerning cost of capital" and has applied to it its "informed judgment." There should be findings of fact with respect thereto so that the reviewing court can know what elements were considered and what effect the testimony was given.