STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; NORTH
CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC.; THE
CITY OF DURHAM; CAROLINA ACTION; KUDZU ALLIANCE; GREAT
LAKES CARBON CORPORATION; AND RUFUS L. EDMISTEN, ATTORNEY
GENERAL v. DUKE POWER COMPANY

No. 49

(Filed 27 January 1982)

1. **Administrative Law § 8; Utilities Commission § 51— electric rate case—standard of judicial review**

    The standard of judicial review of an order of the Utilities Commission in
a rate case increasing a power company's accumulated depreciation account as
an offset to a *pro forma* adjustment by the power company to depreciation expense was whether the order was "affected by error of law," G.S. 62-94(b)(4),
and the standard of review of the Commission's decision fixing the power company's rate of return on common equity was whether the decision was "arbitrary or capricious," G.S. 62-94(b)(6), or "unsupported by competent, material
and substantial evidence in view of the entire record as submitted," G.S.
62-94(b)(5).

2. **Utilities Commission § 56— review of utility rate order**

    The burden of showing the impropriety of rates established by the
Utilities Commission lies with the party alleging such error, and the rate order
will be affirmed if upon consideration of the whole record the appellate court
finds that the Commission's decision is not affected by error of law and the
facts found by the Commission are supported by competent, material and
substantial evidence, taking into account any contradictory evidence or
evidence from which conflicting inferences could be drawn.

3. **Electricity § 3; Utilities Commission § 25— rates for electricity—authority of
Utilities Commission to increase utility's accumulated depreciation account**

    The Utilities Commission had authority under G.S. 62-133 to reduce a
power company's rate base by increasing its accumulated depreciation account

1

Utilities Commission v. Duke Power Co.

as an offset to a *pro forma* adjustment by the power company in the same amount to annualize its actual test year depreciation expense. G.S. 62-133(b)(1), (c) and (d).

4. **Electricity § 3; Utilities Commission § 41— electric rates— fair rate of return on common equity—rejection of power company's uncontradicted testimony—statement of reasons in order**

The Utilities Commission may reject the uncontradicted testimony of a power company's expert witnesses as to the fair rate of return on the company's common equity, and while the better practice is for the Commission to state in its order its reasons for rejecting such testimony, it is not required to do so as a matter of law. Furthermore, the Commission in this rate case sufficiently explained in its order that it rejected uncontradicted testimony by the power company's expert witnesses that a fair rate of return on common equity was 15% to 15.5% because, based on the company's historical experience, the company would continue to be successful in competing for funds in the open market by earning a rate of return on common equity of 14.1%.

5. **Utilities Commission § 24— rate case—consideration of "other material facts"—findings in final order**

The "other material facts of record" considered by the Utilities Commission pursuant to G.S. 62-133(d) in fixing reasonable and just rates must be found and set forth in its order so that the reviewing court may see what these elements are.

6. **Electricity § 3; Utilities Commission § 41— fair return on common equity—determination by Utilities Commission—sufficiency of evidence**

The Utilities Commission's determination that 14.1% was a fair rate of return on common equity for a power company was supported by competent, material and substantial evidence in the record and was thus not arbitrary, capricious or unreasonable.

Justice CARLTON concurring in part, dissenting in part.

Chief Justice BRANCH and Justice EXUM join in this dissenting opinion.

APPEAL as of right by Duke Power Company (hereinafter "Duke") pursuant to G.S. § 7A-30(3) from a decision of the Court of Appeals, 51 N.C. App. 698, 277 S.E. 2d 444 (1981), affirming an order of the North Carolina Utilities Commission (hereinafter the "Commission") in a general rate-making case. The proceeding before the Commission is identified as Docket No. E-7, Sub. 289.

Two issues are presented by this appeal:

(1) May the Commission under the rate-making powers conferred by G.S. § 62-133 reduce a utility's rate base by increasing

its accumulated depreciation account as an offset to a *pro forma* adjustment by the utility in the same amount to depreciation expense? We conclude that it may.

(2) May the Commission reject the uncontradicted testimony of a utility's expert witnesses as to the fair rate of return on the utility's common equity, and if so, whether the Commission in its order establishing a lower rate of return must state its reasons for rejecting such uncontradicted evidence? We conclude that the Commission may reject such testimony and, while the better practice is for the Commission to state its reasons for doing so, it is not required to do so as a matter of law.

We find the proceedings before the Commission and the Commission's order of rate determination proper and affirm the Court of Appeals.

*Steve C. Griffith, Jr., Clarence W. Walker and Stephen K. Rhyne for Defendant-Appellant Duke Power Company.*

*Paul L. Lassiter for Plaintiff-Appellee North Carolina Utilities Commission Public Staff.*

*Byrd, Byrd, Ervin, Blanton & Whisnant, P.A. by Robert B. Byrd for Plaintiff-Appellee Great Lakes Carbon Corporation.*

*Thomas R. Eller, Jr., for Plaintiff-Appellee North Carolina Textile Manufacturers Association, Inc.*

*M. Travis Payne for Plaintiff-Appellee Kudzu Alliance.*

*W. I. Thornton, Jr., for Plaintiff-Appellee City of Durham.*

MEYER, Justice.

On 29 February 1980 Duke filed an application with the Commission to adjust and increase its rates and charges for electric service to its retail customers in North Carolina by an average of approximately 9.61% or $91,572,000. In the application, Duke proposed to make the rate adjustments effective 30 March 1980. In an order dated 21 March 1980, the Commission determined, *inter alia*, that the application constituted a general rate case (G.S. § 62-137), suspended the proposed adjustments for a period of up

to 270 days (G.S. § 62-134), and ordered public hearings on the proposed rates and publication of notices of such hearings. The Commission set the test period as the twelve month period ending 31 December 1979. After interventions, the matter was heard by the Commission in public hearings in various areas of the State through June and July, 1980.

On 7 October 1980, the Commission issued its Final Order which disallowed $34,122,000 of the increase requested by Duke and allowed $57,450,000 thereby reducing the increase from the requested 9.61% to 6.03% or 63% of the amount requested. The increase was allowed for service rendered on and after 3 October 1980. In its Final Order the Commission, *inter alia*, (1) increased Duke's accumulated depreciation account, thereby reducing the rate base, by the amount of $3,879,000 as an offset to a *pro forma* adjustment in that same amount made by Duke in its test year depreciation expense and (2) fixed the rate of return on common equity at 14.1%. One commissioner dissented from the Final Order on the ground that there was no evidence to support the Commission's determination as to the fair rate of return on equity.

Duke appealed and the Court of Appeals allowed Duke's motion for accelerated hearing and decision of appeal by order dated 13 January 1981. In an opinion filed 5 May 1981, the Court of Appeals concluded that "[i]t is reasonably certain that the final disposition of this appeal will be determined by the Supreme Court [and] [w]e, therefore, will not attempt to recapitulate the evidence or set out a detailed statement of [our] reasoning . . . ." The Court of Appeals then held that the Commission's adjustment to Duke's accumulated depreciation account does not contravene G.S. § 62-133(b)(1) and (c), and that the Commission's determination of a 14.1% fair rate of return on common equity is supported by competent evidence and that the Commission adequately stated the reasons for its determination.

Duke's exceptions before the Court of Appeals and before this Court relate solely to two components of the Commission's rate determination. Duke contends that the Commission erred, first, by understating Duke's rate base by improperly deducting therefrom $3,879,000 in accumulated depreciation contrary to G.S. § 62-133(b)(1); and second, by failing to state and explain its reasons for failing to follow Duke's uncontradicted evidence that

15.0% was the minimum fair rate of return on its common equity. We do not find that the Commission erred in either respect.

## I. STANDARD OF JUDICIAL REVIEW

[1]  Before proceeding to address the substantive issues of this case, we must first determine the appropriate standard of judicial review of the Commission's rate determination order.

Duke's appeal to this Court of the decision of the Court of Appeals is as of right pursuant to G.S. § 7A-30(3). *See also* G.S. § 62-96. Duke's appeal to the Court of Appeals was pursuant to G.S. § 7A-29. *See also* G.S. § 62-90. G.S. § 62-94(b) specifies the standard of judicial review by the Court of Appeals.

> That section provides, *inter alia*, that the reviewing court may (1) affirm, (2) reverse, (3) declare null and void, (4) modify, or (5) remand for further proceedings, decisions of the Commission. The Court's power to affirm or remand is not specifically circumscribed by the statute. However, the power of the Court to reverse or modify and, *a fortiori*, to declare null and void, is substantially circumscribed to situations in which the court must find (a) that appellant's substantial rights, (b) have been prejudiced, (c) by Commission findings, inferences, conclusions or decisions which are
>
> > (1) in violation of constitutional provisions; or
> >
> > (2) in excess of statutory authority or jurisdiction of the Commission, or
> >
> > (3) made upon unlawful proceedings, or
> >
> > (4) affected by other errors of law, or
> >
> > (5) unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
> >
> > (6) arbitrary or capricious.

*Utilities Comm. v. Oil Co.*, 302 N.C. 14, 19-20, 273 S.E. 2d 232, 235 (1981).

Subsection (c) of G.S. § 62-94 requires the reviewing Court, in making the foregoing determinations, to "review the whole record." In order to determine whether the decision of the Court of Appeals is proper, this Court must determine which of the

listed criteria the Court of Appeals should have addressed and whether that court addressed those criteria in its review of the proceedings and order of the Commission. The criteria to be employed is in turn determined by the issues presented to the Court of Appeals, for it is the nature of the contended error that dictates the criteria.

As to the issue concerning depreciation, Duke presented in its brief to the Court of Appeals the following issue:

1. Did the Commission's action in reducing the original cost of Duke's property in service at the end of the test period by an amount of depreciation which did not represent a portion of original cost "consumed by previous use recovered by depreciation expense" contravene G.S. §§ 62-133(b)(1) and (c)?

The Court of Appeals answered that issue as follows:

With regard to the first question presented in the appellant's brief, in our opinion, the Commission was correct in reducing Duke's rate base by increasing its depreciation reserve by $3,879,000 due to the fact that Duke had made similar adjustments to its depreciation and amortization expenses for the test year without making corresponding adjustments to its accumulated depreciation account. The adjustments did not contravene N.C. Gen. Stat. § 62-133(b)(1) and (c). Morever, we believe that without such adjustments, Duke's rates would have been artificially high, thereby allowing it to earn more than a fair rate of return.

It is apparent that both Duke and the Court of Appeals treated the issue as a contention that the action of the Commission, in making the adjustment to accumulated depreciation, was "affected by error of law." The Court of Appeals applied the correct criteria for review as it held that the adjustment to accumulated depreciation "did not contravene N.C. Gen. Stat. § 62-133(b)(1) and (c)." Having determined that the Court of Appeals applied the correct standard of review on the depreciation issue, this Court must consider whether the Court of Appeals erred in affirming the action of the Commission.

As to the issue concerning the rate of return on equity fixed by the Commission, Duke presented in its brief to the Court of Appeals the following issue:

2. Is the Commission's determination that 14.1% is a fair rate of return on equity unsupported by substantial evidence and arbitrary and capricious when (i) the Commission rejected, without setting out any justification, uncontradicted evidence that 15.0% is the minimum fair rate of return on equity and (ii) the method by which the Commission established the rate of return on equity cannot be determined from the Commission's order?

The Court of Appeals answered that issue as follows:

With regard to the second question presented in appellant's brief, in our opinion, the Commission's determination that 14.1% is a fair rate of return on common equity is fully supported by the record and was not arbitrary and capricious. In its order, the Commission made findings supported by competent evidence and adequately stated the reasons for its determination that 14.1% should be the rate of return on Duke's common equity.

We conclude from the issue presented and the conclusion reached by the Court of Appeals on the issue of the rate of return on equity that both Duke and the Court of Appeals treated the issue as a contention that the Commission's decision in fixing the rate of return at 14.1% was "arbitrary or capricious" or "unsupported by competent, material and substantial evidence in view of the entire record as submitted." It is obvious to this Court that the Court of Appeals applied the correct criteria for review as it held that the Commission's determination of 14.1% rate of return "is fully supported by the record and was not arbitrary and capricious" and that the Commission "made findings supported by competent evidence and adequately stated the reasons for its determination . . . ." Having determined that the Court of Appeals applied the correct standard of review on the rate of return issue, this Court must consider whether the Court of Appeals erred in holding that the Commission's decision was not abritrary or capricious and was in fact supported by the record.

## II.   THE STATUTE

For a proper understanding of the issues presented by this appeal and addressed by this Court, it is necessary to set forth the provisions of G.S. § 62-133(a) through (d) in their entirety.

(a)   In fixing the rates for any public utility subject to the provisions of this Chapter, other than motor carriers and certain water and sewer utilities, the Commission shall fix such rates as shall be fair both to the public utility and to the consumer.

(b)   In fixing such rates, the Commission shall:

(1)   Ascertain the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, less that portion of the cost which has been consumed by previous use recovered by depreciation expense plus the reasonable original cost of investment in plant under construction (construction work in progress). In ascertaining the cost of the public utility's property, construction work in progress as of the effective date of this subsection shall be excluded until such plant comes into service but reasonable and prudent expenditures for construction work in progress after the effective date of this subsection shall be included subject to the provisions of subparagraph (b)(5) of this section.

(2)   Estimate such public utility's revenue under the present and proposed rates.

(3)   Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

(4)   Fix such rate of return on the cost of the property ascertained pursuant to subdivision (1) as will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

(4a) Require each public utility to discontinue capitalization of the composite carrying cost of capital funds used to finance construction (allowance for funds) on the construction work in progress included in its rate base upon the effective date of the first and each subsequent general rate order issued with respect to it after the effective date of this subsection; allowance for funds may be capitalized with respect to expenditures for construction work in progress not included in the utility's property upon which rates were fixed. In determining net operating income for return, the Commission shall not include any capitalized allowance for funds used during construction on the construction work in progress included in the utility's rate base.

(5) Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to subdivision (3) of this subsection the rate of return fixed pursuant to subdivisions (4) and (4a) on the cost of the public utility's property ascertained pursuant to subdivision (1).

(c) The original cost of the public utility's property, including its construction work in progress, shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time. The test period shall consist of 12 months' historical operating experience prior to the date the rates are proposed to become effective, but the Commission shall consider such relevant, material and competent evidence as may be offered by any party to the proceeding tending to show actual changes in costs, revenues or the cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, including its construction work in progress, which is based upon circumstances and events occurring up to the time the hearing is closed.

(d) The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates.

Certain fundamental legal principles are applicable and must be adhered to in applying the statute in the resolution of the issues before us. We begin with the proposition that the Commission is vested with the power to regulate the rates charged by utilities. G.S. § 62-2. The General Assembly has delegated to the Commission, and not to the courts, the duty and power to establish rates for public utilities. *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487 (1966), *citing Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 130 S.E. 2d 890 (1963). The rates fixed by the Commission must be just and reasonable. G.S. §§ 62-130 and 131. *See Telephone Co. v. Clayton, Comr. of Revenue*, 266 N.C. 687, 147 S.E. 2d 195 (1966). Rates fixed by the Commission are deemed *prima facie* just and reasonable. G.S. § 62-94(e).

[2] The burden of showing the impropriety of rates established by the Commission lies with the party alleging such error. *See Utilities Commission v. Light Co.* and *Utilities Commission v. Carolinas Committee*, 250 N.C. 421, 109 S.E. 2d 253 (1959). The rate order of the Commission will be affirmed if upon consideration of the whole record we find that the Commission's decision is not affected by error of law and the facts found by the Commission are supported by competent, material and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn. *See Utilities Comm. v. Springdale Estates Assoc.*, 46 N.C. App. 488, 265 S.E. 2d 647 (1980). Of course, an appellant may show on appeal that the Commission's order is not supported by competent, material and substantial evidence. *Utilities Comm. v. Edmisten, Attorney General*, 291 N.C. 424, 230 S.E. 2d 647 (1976); *Utilities Commission v. Coach Co.*, 261 N.C. 384, 134 S.E. 2d 689 (1964); *Utilities Commission v. R. R.*, 238 N.C. 701, 78 S.E. 2d 780 (1953).

### III. DEPRECIATION

[3] Duke by this appeal seeks the ultimate reversal of the Commission's order which increased Duke's accumulated depreciation account by $3,879,000 as an offset to a *pro forma* adjustment of the same amount made by Duke to its test period depreciation expenses. We are here concerned only with adjustments *for the test period*. We are not concerned in this case with adjustments for changes occurring *after the test period* but before the hearing.

The figure of $3,879,000 is the total of two adjustments by Duke:

| | |
|---|---|
| Adjustment to annualize depreciation expense ................... | $2,076,000 |
| Adjustment to annualize nuclear fuel disposal cost ...................... | 1,803,000 |
| | $3,879,000 |

While, at present, construction work in progress (CWIP) may be included in the rate base as construction of a facility progresses, it is not depreciated (and therefore not added to accumulated depreciation) until the completed facility comes into service, or in the statute's terminology, until it is used or useful in providing service rendered to the public. Duke made the *pro forma* adjustment to the test period depreciation expenses to annualize those expenses—that is, to adjust the test year depreciation expenses to reflect a full year's depreciation which it will be entitled to in the future year when the rates being considered would be effective, rather than the partial year reflected in the actual test year's depreciation expenses for facilities which came into service at various times during the test year and were depreciated only for a part of the year.

The Commission, in effect, concluded that Duke added $3,879,000 as a *pro forma* adjustment to its operating expenses for the test period to compensate for future depreciation expense without flowing a corresponding amount to its accumulated depreciation reserve. Duke contends that this is authorized because one section of the statute (G.S. § 62-133(c)) allows an adjustment favorable to them for future depreciation expense while another section of the statute (G.S. § 62-133(b)(1)) does not allow, and indeed prohibits, a corresponding and offsetting adjustment to its rate base. We do not agree.

Duke's position with regard to the Commission's offsetting adjustment in the accumulated depreciation account is fully and accurately reflected in the testimony of its witness William R. Stimart, Duke's financial and accounting expert, who testified that such a deduction in the rate base was inappropriate because it did not represent depreciation that had been collected from ratepayers:

I have not deducted from rate base the adjustment to annualize depreciation expense consistent with G.S. 62-133(b)(1) which states that the original cost of a public utility's property is to be reduced by 'that portion of the cost which has been consumed by previous use recovered by depreciation expense.' The amount of this adjustment to depreciation expense has not been consumed by previous use recovered by depreciation expense. Since the proposed rates will not become effective until after the test period, the ratepayers will not have paid the level of depreciation expense we are seeking in this case. (R.p. 114)

The Commission acknowledged that the additional $3,879,000 it added to the accumulated depreciation reserve and subtracted from the rate base had not been collected from Duke's customers. (R.pp. 2 & 5)

Duke vigorously contends that the Commission's action in reducing its rate base is contrary to what Duke considers to be the legislature's mandate in G.S. § 62-133(b)(1) that the rate base consist of the plant in service at the end of the test period. Duke argues that this issue is controlled by the well-established principle of statutory construction that a section of a statute dealing with a specific situation controls, with respect to that situation, other sections which are general in their application, and that when the section dealing with a specific matter is clear and understandable on its face, it requires no construction. *See Phillips v. Phillips*, 296 N.C. 590, 596, 252 S.E. 2d 761, 765 (1979); *Utilities Commission v. Electric Membership Corp.*, 275 N.C. 250, 260-61, 166 S.E. 2d 663, 670 (1969); *Utilities Commission v. Coach Co.*, 236 N.C. 583, 588-89, 73 S.E. 2d 562, 566 (1952). Duke contends that since G.S. § 62-133(b)(1) deals specifically with the issue of what depreciation may be deducted from plant in service in determining rate base, that specific statutory section is controlling. While we recognize the validity of this principle of construction urged by Duke, it is not controlling here.

Though we are dealing with several sections and subsections of G.S. § 62-133, we are here dealing with but *one* statute. By the adoption of this statute, the legislature intended to establish an overall scheme for fixing rates, and it must be interpreted in its entirety in order to comply with the legislative intent. In this in-

stance the more appropriate principle of statutory construction is stated as follows:

> The different parts of a statute reflect light upon each other, and statutory provisions are regarded as in pari materia where they are parts of the same act. Hence, a statute should be construed in its entirety, and as a whole. All parts of the act should be considered, and construed together. It is not permissible to rest a construction upon any one part alone, or upon isolated words, phrases, clauses, or sentences, or to give undue effect thereto. The legislative intention, as collected from an examination of the whole as well as the separate parts of a statute, is not to be defeated by the use of particular terms.

73 Am. Jur. 2d *Statutes* § 191 (1974).

As we subsequently demonstrate herein, Duke itself was dependent on this latter principle of statutory construction in increasing *pro forma* its actual test year depreciation expense by $3,879,000.

The Commission increased accumulated depreciation to reflect that Duke's ratepayers were being charged a full year's depreciation, for ratemaking purposes, on such plant despite the fact that such plant was not in service for the full year. It is axiomatic that an increase in accumulated depreciation results in a decrease in the rate base. The utility's rate base is determined in pertinent part by ascertaining the original cost of plant in service and subtracting therefrom the reserve for accumulated depreciation. Therefore any increase in the reserve for accumulated depreciation causes a corresponding reduction in the rate base. It follows, of course, that when the approved rate of return is applied to the rate base thus reduced, the ultimate result is the prospect of a lower level of revenues for Duke. It is this adjustment to accumulated depreciation that Duke contends is error.

We will now consider whether the statute authorizes the reduction in rate base resulting from the Commission's adjustment to accumulated depreciation to offset Duke's *pro forma* adjustment increasing test year depreciation expense not actually booked in depreciation expense for the test year.

The basic underlying theory of using the company's operating experience in a recently ended test period in fixing

rates to be charged by it for its service in the near future is that rates for service, in effect throughout the test period, will in the near future produce the same rate of return on the company's property as was produced by them on such property in the test period, *adjusted for known changes in conditions. Utilities Comm. v. Morgan, Attorney General,* 278 N.C. 235, 179 S.E. 2d 419 (1971). Duke correctly argues that to properly reflect probable future costs and revenues, the Commission must increase its test year expenses, *i.e.,* depreciation expense, by $3,879,000 thereby reducing its net income by this same amount. This adjustment is consistent with the Commission's statutory mandate and is appropriate. Duke would have this Court believe that even though this *pro forma* adjustment is proper to reflect probable future operations, it is somehow improper to increase the accumulated depreciation account (thereby reducing rate base) by the same amount in order fairly to reflect what the proper rate base should be. Duke would have us apply an unrealistic and narrow interpretation of G.S. § 62-133(b)(1) that would in effect negate the meaning and purpose of G.S. § 62-133 when read as a whole.

Duke relied on G.S. § 62-133(c) to increase its expenses for depreciation by $3,879,000. G.S. § 62-133(b)(3) does not authorize adjustments for anticipated changes in expenses after the test period such as increased depreciation for the coming year. The only language authorizing such an adjustment is contained in G.S. § 62-133(c). If G.S. § 62-133(b)(3) is read without reference to G.S. § 62-133(c), then Duke would lack the authority to increase its actual depreciation expense by a *pro forma* adjustment of $3,879,000 as such adjustment is for "probable future expense." The courts, however, have interpreted these statutory provisions, taken together, to allow the Commission to make *pro forma* adjustments to revenue and expenses to reflect what their effect would have been had those future conditions prevailed throughout, or at the end of, the test period or to adjust for abnormalities and changes in conditions. *Utilities Comm. v. Morgan, Attorney General,* 278 N.C. 235, 179 S.E. 2d 419 (1971); *see also Utilities Comm. v. Power Co.,* 285 N.C. 377, 206 S.E. 2d 269 (1974); *Utilities Comm. v. Power Co.,* 285 N.C. 398, 206 S.E. 2d 283 (1974). Our cases thus hold that G.S. § 62-133(b)(3) shall be read in conjunction with G.S. § 62-133(c).

To be consistent, G.S. § 62-133(b)(1) must also be read in conjunction with G.S. § 62-133(c). Just as G.S. § 62-133(b)(3) does not authorize adjustments for probable future changes in expenses past the test period, G.S. § 62-133(b)(1) does not authorize adjustment for probable future changes in the original cost rate base of a utility after the test period. As discussed above, the authority for the adjustment for actual future changes to the original cost rate base is contained in G.S. § 62-133(c). These two sections must also be read in conjunction with each other. If depreciation expense is increased to compensate for increased depreciation in the coming year through *pro forma* adjustment, then offsetting adjustments should be made to the accumulated depreciation account. To isolate the provisions as Duke argues would defeat the overall scheme of G.S. § 62-133. This Court has said that: "If an act is susceptible to more than one construction, the consequences of each are a potent factor in its interpretation, and undesirable consequences will be avoided if possible." *Little v. Stevens,* 267 N.C. 328, 336, 148 S.E. 2d 201, 207 (1966). G.S. § 62-133 is not reasonably susceptible of two interpretations; but, even if it were, we would reject Duke's argument in that it would defeat the purpose of G.S. § 62-133 when read as a whole:

> In the interpretation of statutes the legislative will is the controlling factor. 'Indeed, it is frequently stated in effect that the intention of the legislature constitutes the law.' 73 Am. Jur. 2d, Statutes § 145 (1974). A construction which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language. *Ballard v. Charlotte,* 235 N.C. 484, 70 S.E. 2d 575 (1952). Where possible, the language of a statute will be interpreted so as to avoid an absurd consequence. *Hobbs v. Moore County,* 267 N.C. 665, 149 S.E. 2d 1 (1966); *Young v. Whitehall Co.,* 229 N.C. 360, 49 S.E. 2d 797 (1948); *State v. Scales,* 172 N.C. 915, 90 S.E. 439 (1916); *State v. Earnhardt,* 170 N.C. 725, 86 S.E. 960 (1915).

*State v. Hart,* 287 N.C. 76, 80, 213 S.E. 2d 291, 294-95 (1975). Clearly, the Commission has followed the "legislative will" in its application of G.S. § 62-133 when the entire statute is viewed as an integrated entity. When the statute is separated into its constituent components, there is no conflict between the components in contemplation of law.

With regard to the adjustment to accumulated depreciation, Public Staff Witness William W. Winters testified as follows:

On my Schedule 2-2(a) I calculated an increase of $2,076,000 in the North Carolina retail balance of accumulated depreciation and amortization. Mr. Stimart made an adjustment to depreciation expense of this amount but failed to make the corollary increase to accumulated depreciation and amortization. By increasing depreciation expense to an end-of-period level, the ratepayers will have to pay in rates to cover additional depreciation expense as if the plant in service at the end of the test year had been in service for the entire test year. If, in fact, the end-of-period plant level had been in service throughout the test year, the depreciation reserve would have been $2,076,000 greater than the amount recorded at the end of the test year. If the ratepayers are required to pay in rates to cover depreciation expense which had not been incurred at the end of the test period, it is only fair and equitable that they be given the benefit of that additional depreciation in determining the end-of-period level of accumulated depreciation.

On my Schedule 2-1(b) I calculated an increase of $1,803,000 in the North Carolina retail balance of accumulated depreciation and amortization. Mr. Stimart made an adjustment to annualize nuclear fuel disposal cost but failed to make the corollary increase to accumulated depreciation and amortization. The rationale for increasing the balance of accumulated depreciation and amortization for this item is analagous to the explanation in the preceding paragraph. (R. p. 152-53).

With regard to the evidence and conclusions for its Finding of Fact No. 6 (the original cost of Duke's property) the Commission quoted a portion of Mr. Winter's testimony and then said:

With respect to this issue, Company witness Stimart testified as follows:

'I have not deducted from rate base the adjustment to annualize depreciation expense. Consistent with G.S. 62-133(b)(1) which states that the original cost of a public utility's property is to be reduced by 'that portion of the

cost which has been consumed by previous use recovered by depreciation expense.'

In a recent Duke general rate case, Docket No. E-7, Sub 237, the Commission concluded that:

'In arriving at a proper level of operating revenue deduc-tions which is consistent with the test year level of investment the Commission has added an amount to depreciation expense to annualize depreciation applicable thereto. It is therefore, entirely consistent and proper to make the corollary adjustment to accumulated depreciation. The Commission acknowledges that the pro forma adjustment to depreciation expense has not been collected from the company's customers during the test year. However, when considering the test year, the company has, in fact, not actually incurred such cost. Further, the Commission believes that the corollary adjustment to accumulated expense is necessary to achieve a proper and equitable matching of revenues and costs.'

The Commission does not believe that the evidence in this case warrants a change in the Commission's position with respect to this matter. The Commission, therefore, concludes that the adjustment of $2,076,000 proposed by the Public Staff to increase accumulated depreciation to give full effect to the pro forma adjustment to annualize depreciation expense is proper. Further, based upon the same reasoning, the Commission concludes that it is proper to increase accumulated amortization by $1,803,000 to reflect the effect of the pro forma adjustment to annualize nuclear fuel disposal cost. (R. p. 245-46).

We find that the Commission was fully justified in that conclusion.

If, as here were facilities come into service at various times during the test year, Duke is allowed to make the *pro forma* adjustment to the test year depreciation expense to reflect the future depreciation revenue requirement of a full year's depreciation and is not required to increase its accumulated depreciation account by the same amount to reflect what it would have been had the facilities been in the rate base for the full year, its customers would pay not only the adjustment for increased

depreciation but would also pay a rate of return on an inflated rate base. If we followed Duke's argument, the $3,879,000 of additional revenues required for this item of expense would be applied to an artificially inflated rate base, resulting in a more than fair rate of return for Duke.[1]

In construing the provisions of G.S. § 62-133, the Commission must also consider section (d) of the statute. Fundamental to an understanding of the conclusion reached by this Court in the decision of this case is an appreciation of the force and effect of subsection (d) which provides as follows: "(d) The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates." The plain meaning of subsection (d) is that, after considering all other factors, considerations and adjustments specifically set forth in the various sections of the statute, the Commission must consider "all other material facts of record" which ought to be taken into consideration in setting rates which are reasonable and just. In this regard, the fact that Duke increased its depreciation expense by a *pro forma* adjustment was a material fact of record. Consequently, the Commission had the duty pursuant to G.S. § 62-133(d) to consider the effect that such adjustment should have on accumulated depreciation so that the Commission could determine what would be reasonable and just rates.

---

1. This can perhaps be illustrated by using a variation of the formulas for ratemaking set out in Justice Carlton's dissent.

Original cost of property in service at end of test year.

* - Accumulated depreciation recovered by depreciation expense.
+ Reasonable original cost of plant under construction (CWIP).
± Adjustments for events occurring between the end of the test year and the beginning of the hearing.

= Rate base.
x Fair rate of return.

= Return on property.
* ± Adjustments for probable future revenues and expenses based on plant and equipment.

= Level of revenue.

Simply put, the future year's increased depreciation revenue requirement adjustment was properly allowed at the point in the formula designated by the second asterisk. Since the adjustment in effect simulates a situation wherein depreciation for an entire year has been allowed *in the test period* a corresponding and offsetting adjustment should be made to simulate that such depreciation was reserved or accumulated for the entire test year. This corresponding adjustment should occur in the formula designated by the first asterisk so that a rate of return will not be earned on the amount added by the first adjustment.

In reducing Duke's rate base by the addition to the accumulated depreciation account of $3,879,000 the Commission acted within its statutory power. To have allowed Duke to claim a $3,879,000 increase in depreciation expenses in its rates and not have required an offsetting adjustment to accumulated depreciation expense would have in effect resulted in a windfall to Duke and a penalty to its customers. If we followed the narrow interpretation of the statute suggested by Duke, the effect would be to annualize one factor and not the other. This was one of the "other material facts" which the Commission is required by G.S. § 62-133(d) to consider in determining "what are reasonable and just rates."

When the Commission allowed Duke to annualize its actual test year depreciation expenses (i.e. increase them to reflect what they would have been had all of its property used and useful at the end of the test year been in service for the entire test period), it correctly applied a corresponding or offsetting adjustment to increase the accumulated depreciation account to reflect what it would have been had that property been in service for the entire test year.

We hold that the Commission did not err in increasing Duke's accumulated depreciation account by the amount of $3,879,000 to offset a corresponding adjustment which Duke had made to annualize its depreciation expense for the test year.

### IV. RATE OF RETURN

Duke contends in its brief that the rate of return fixed by the Commission (14.1%) is arbitrary and capricious and not supported by substantial evidence because the determination of that rate is contrary to Duke's uncontradicted evidence and because the Commission stated no justification or explanation for its rejection of such uncontradicted evidence.[2]

---

2. On oral argument Duke apparently narrowed its objection as to the rate of return issue. The following statement was made by Duke's counsel on oral argument as transcribed from our electronic recording of the oral arguments:

We do not question the power of the Commission to reject uncontradicted evidence. Nor do we question the power of the Commission to compute a fair rate of return within the evidence. Nor are we contesting the amount of the rate of return fixed by the Commission in this proceeding. We do contest, however, the Commission's authority to reject uncontradicted evidence without giving its reasons for doing so.

Utilities Commission v. Duke Power Co.

We will consider Duke's contentions with regard to the 14.1% rate of return on common equity by addressing the following questions:

(1) May the Commission reject the uncontradicted testimony of Duke's witnesses?

(2) Must the Commission specify and explain its reasons for rejecting uncontradicted testimony?

(3) Is the rate of return fixed by the Commission supported by substantial evidence in the record?

(1)

[4] May the Commission reject the uncontradicted testimony of Duke's witnesses as to the fair rate of return? We conclude that it may.

The only evidence before the Commission as to the rate of return on equity was the testimony of Dr. Stephen F. Sherwin and Mr. W. H. Grigg. Their testimony was to the effect that a reasonable rate of return on equity is between 15.0% and 15.5%. Dr. Sherwin, an expert on rate of return, was called by Duke to testify as to the rate of return on equity. His opinion that a fair rate of return on equity for Duke is in the range of 15.0% to 15.5% was based on the results of three studies. These studies examine the question of what rate of return on equity is necessary to enable Duke:

(1) to achieve a level of earnings comparable to those earned by other enterprises with corresponding risks and uncertainty. In estimating the cost of the equity capital to Duke he utilized three methods to derive his estimate. The first method was a comparable earnings test with reference to three groups of industrial firms. A large sample of American industry, the Standard & Poor's 400-company industrial composite; and five different samples of manufacturers with risk characteristics which he contended were similar to those of Duke. From this method, witness Sherwin concluded that Duke's cost of equity capital was in the range of 15.0% to 15.5%.

---

Nevertheless we have elected to treat in the body of our opinion both the question of the power of the Commission to reject uncontradicted evidence and the question of the amount of the rate of return fixed by the Commission.

(2) to maintain its financial integrity. Dr. Sherwin made a comparison of electric utility market-to-book ratios and earnings with those of industrial firms. From this analysis, Dr. Sherwin concluded that a reasonable equity return was 15.0% to 15.5%.

(3) to attract capital on reasonable terms. Witness Sherwin concluded that in order to attract capital on reasonable terms, the current cost, including financing costs, would be 14.8% to 15.3%.

At the close of Dr. Sherwin's testimony, no party to the proceeding cross-examined him, and he was not questioned by any commissioner. No other witness presented any contrary evidence as to rate of return. Duke's witness Grigg, a senior vice president of the company who testified that 15.0% was a reasonable rate of return, was the only other witness to testify as to rate of return. No other party to the proceeding presented any evidence as to rate of return.

It is well settled that the credibility of witnesses and the probative value of particular testimony are for the administrative body to determine, and it may accept or reject in whole or in part the testimony of any witness. While an administrative body must consider all of the evidence and may not disregard credible undisputed evidence, it is not required to accept particular testimony as true. 73 C.J.S. *Public Administrative Bodies and Procedure* § 126 (1951).

North Carolina is in accord with the well-established rule that it is for the administrative body, in an adjudicatory proceeding, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence if any. *Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 406, 269 S.E. 2d 547, 565 (1980). 73 C.J.S., *supra*.

In *Utilities Comm. v. Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974), Justice Lake, in discussing the weighing of various factors in determining the fair value of utility property said this:

As we have said many times, the credibility of the evidence and the weight to be given it in the determination of the 'fair value' of the properties are for the Commission,

not for this Court, to determine . . . . The Commission is not required to accept Mr. Reilly's opinion as to the weight to be given to each of these indicators of fair value, even though there be no contrary expert testimony. As Mr. Reilly testified, the determination of the weighting to be given the indicators is a matter of 'subjective judgment.' The Commission may and should exercise its own expert judgment in this determination. (Citations omitted.)

285 N.C. at 409-10, 206 S.E. 2d at 292.[3]

Justice Lake, again in discussing the weighing of various factors in determining the fair value of property, said in *Utilities Commission v. Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974): "It is the prerogative of the Commission to determine the credibility of evidence before it, even though such evidence be uncontradicted by another witness." 285 N.C. at 390, 206 S.E. 2d at 278. The same principle applies to evidence of the fair rate of return. Judge (now Justice) Britt reiterated that principle in identical language in a case involving the consideration of a witness's testimony concerning rate of return. *Utilities Commission v. Telegraph Co.*, 24 N.C. App. 327, 210 S.E. 2d 543 (1975), *appeal dismissed for mootness*, 289 N.C. 286, 221 S.E. 2d 322 (1976).

This rule comports with the rule as to administrative bodies generally. Uncontrodicted testimony need not be accepted as true by administrative bodies. *See Lawson v. Lawson*, 415 S.W. 2d 313 (Mo. App. 1967); *Koplar v. State Tax Commission*, 321 S.W. 2d 686 (Mo. 1959); *State v. Public Service Commissioner*, 359 Mo. 109, 220 S.W. 2d 61 (1949); *Rozauski v. Glen Alden Coal Co.*, 165 Pa. Super. 460, 69 A. 2d 192 (1949); *Nickolay v. Hudson Coal Co.*, 164 Pa. Super. 550, 67 A. 2d 828 (1949); *Lavely v. Unemployment Compensation Board of Review*, 163 Pa. Super. 66, 60 A. 2d 352 (1948).

---

3. Although G.S. § 62-133 has been amended several times since the decision in *Utilities Comm. v. Power Co.* was rendered and, as amended, the statute now allows post test period considerations, we note that in that decision this Court recognized the possibility of offsetting adjustments. "Adjustments for post test period increases in certain categories of expense may well give a distorted picture of the need for revenue since post test period experience in other categories of expense is not known and the possibility of offsetting adjustments is not precluded." 285 N.C. at 417-18, 206 S.E. 2d at 297.

Even where there is no direct evidence in the record contrary to the expert's opinion, a regulatory body may use its own judgment in evaluating evidence as to a matter within its expertise and is not bound by even uncontradicted testimony of experts. An expert's opinion testimony may be given less credibility and therefore minimum consideration when the expert is friendly or sympathetic to the party on whose behalf he is testifying. The opinion of the expert may simply be intrinsically nonpersuasive even though it is uncontradicted. *See* 4 Mezines, Stein, Gruff, Administrative Law § 28.06 (1981).

Under G.S. § 62-133 the determination of what constitutes a fair rate of return requires the exercise of a subjective judgment by the Commission and its decision may not be disturbed by a reviewing court merely because the court's subjective judgment is different from that of the Commission. Nor is the Commission required to accept as conclusive the subjective judgment of a witness, even though the record contains no expression of a contrary opinion by another witness. *See Utilities Comm. v. Edmisten, Atty. General,* 29 N.C. App. 428, 225 S.E. 2d 101, *affirmed* 291 N.C. 424, 230 S.E. 2d 647 (1976).

We hold therefore that the Commission was not required to accept Duke's experts' evidence as to the fair rate of return, even though there is no contrary expert testimony.

(2)

[4] Duke contends that the Commission must state in its order its reason or reasons for rejecting the uncontradicted testimony. We do not agree.

G.S. § 62-79 requires in effect that the final order of the Commission "shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include: (1) Findings and conclusions and the *reasons or bases therefor upon all the material issues of fact, law or discretion* presented in the record . . . ." (Emphasis added.)

It can be argued that the rejection of uncontradicted expert testimony is a discretionary matter requiring a statement of the reasons for so doing. We are not persuaded by this argument.

We find *Baton Rouge Water Works v. La. Pub. Serv. Comm.,* 342 So. 2d 609, *cert. denied,* 434 U.S. 827 (1977), apposite here. In

that case the utility applied to the Louisiana Public Service Commission to increase its rates so as to produce additional revenues which included a 13% return on equity. After a hearing the Commission allowed a return on equity of only 10.5%. The company appealed alleging that its uncontradicted expert testimony showed that 13% return on equity was necessary in terms of raising and supporting equity capital. The Commission introduced no opposing expert evidence. The Commission concluded that the requested 13% increase was excessive and allowed only 10.5%. The district court found the Commission's allowance of only 10.5% arbitrary, as contrary to the evidence, because the uncontradicted testimony of the company's expert showed that the utility was entitled to a higher rate and modified the Commission's order to allow the higher rate. The Louisiana Supreme Court, with one justice dissenting, held that while it would have been preferable if the Commission's order, in finding that the requested increase was excessive, had specifically stated why the Commission rejected or modified the 13% return on equity which the defendant's expert opinion stated was necessary, nevertheless, where the findings and reason for the Commission's action are necessarily implied by the record and where the appellate court's study of the administrative record shows that there is sufficient evidence to support the Commission's determination, little purpose would be served by a remand for such formality. *See also Little Man's Club v. Schott*, 60 So. 2d 624 (Fla. 1952).

We hold that the Commission is not, as a matter of law, required to set forth in its order its reasons for rejecting uncontradicted opinion testimony. However, like the court in *Baton Rouge*, we believe that it is the better practice for the Commission to do so.

(3)

Although the Commission is not required to state in its final order its reasons for rejecting a utility's uncontradicted evidence as to a fair rate of return, we have concluded that in the record before us the Commission has in fact done so.

We note in particular, as did the Commission, an exhibit sponsored by Dr. Sherwin which compares Duke's rate of return on average common equity in recent years to that of forty-one other electric utilities and with eighty-six electric and electric-gas utilities. That exhibit is Schedule 15 of Sherwin's Exhibit I before the Commission and a partial summary is as follows:

RATE OF RETURN ON AVERAGE COMMON STOCK EQUITY
(averages)

| YEAR | DUKE POWER | 41 ELECTRIC UTILITIES | 86 ELECTRIC and ELECTRIC-GAS UTILITIES |
|---|---|---|---|
| 1975 | 9.6% | 12.0% | 11.7% |
| 1976 | 12.7% | 11.9% | 12.0% |
| 1977 | 12.2% | 11.8% | 11.7% |
| 1978 | 12.8% | 11.5% | 11.6% |
| 1979 | 13.1% | 11.1% | 11.5% |

RATE OF RETURN ON AVERAGE COMMON STOCK EQUITY
(medians)

| YEAR | DUKE POWER | 41 ELECTRIC UTILITIES | 86 ELECTRIC and ELECTRIC-GAS UTILITIES |
|---|---|---|---|
| 1975 | 9.6% | 12.5% | 12.0% |
| 1976 | 12.7% | 11.6% | 11.6% |
| 1977 | 12.2% | 11.7% | 11.5% |
| 1978 | 12.8% | 11.3% | 11.6% |
| 1979 | 13.1% | 10.9% | 11.5% |

In speaking of the rate of return of 14.1% on common equity fixed by the Commission as being "fair and reasonable, both to Duke's rate payers and its investors," the Commission said this:

With respect to this determination, the Commission notes that although Company witness Sherwin was not cross-examined at the hearing, and although no other party to the proceeding presented evidence on the issue of rate of return, it is, without doubt, the prerogative of this Commission to determine the credibility of the evidence before it, even though such evidence may have been uncontradicted by another witness. *Utilities Commission v. Duke Power Company,* 285 N.C. 377, 206 S.E. 2d 269 (1974).

Furthermore, as Chief Justice Hughes said, in *Lindheimer v. Illinois, Bell Telephone Co.,* 292 U.S. 151, 163-164, 54 S.Ct. 658, 78 L.Ed. 1182 (1934), the actual experience of a utility in the attraction of capital, under the rates of which it complains, is often more convincing than tabulations of experts and '[e]laborate calculations which are at war with realities are of no avail.'

In this regard the Commission strongly believes that the evidence reflected in Sherwin Exhibit I, Schedule 15, clearly supports the rate of return the Commission has hereinabove found fair. (R. p. 273)

The Commission obviously felt that Dr. Sherwin's estimates of a fair rate of return on common equity based upon his studies and calculations were at odds with Duke's actual experience as reflected in Sherwin's Exhibit I, Schedule 15.

Schedule 15 also shows that Duke's market-to-book ratio (the market value of its common stock, divided by the book value per share) has been above the utility group averages for every year since 1976. Schedule 15 shows that Duke's rates of return have met, and still meet, the profitability and competing-for-funds tests of G.S. § 62-133(b)(4), and that Duke's stock has a higher value in the market in relation to its book value than do the stocks of the major electric utilities reported by Duke's witness Sherwin.

The Commission quite obviously believed what is obvious from any fair appraisal of Schedule 15 — that Duke in recent years has been comparatively successful in competing for funds in the open market. It is clear from the record that the Commission felt that, based on this historical experience, Duke would continue to be successful in competing for funds earning a fair return for its investors at a rate of return on common equity of 14.1% as opposed to the 15.0% to 15.5% estimated by witnesses Sherwin and Grigg.[4]

The Commission *is*, of course, required to set forth factors it considers in fixing reasonable and just rates which are not enumerated in G.S. § 62-133. Subsection (d) of G.S. § 62-133 requires the Commission, in fixing rates, to consider "all other material facts of record." The statute does not contemplate that the Commission may "roam at large in an unfenced field." Justice Higgins in *Utilities Commission v. Public Service Co.*, 257 N.C. 233, 237, 125 S.E. 2d 457, 460 (1962). We believe the legislature recognized and understood that there would be other facts and circumstances of record which the Commission might rightly consider in addition to those specifically detailed in G.S. § 62-133.

[5] Prior to the 1976 and subsequent amendments to G.S. § 62-133(b)(1) the Commission, in considering the reasonable original cost of a utility's property, was required to consider any

---

4. We do not find *Comr. of Insurance v. Rating Bureau*, 292 N.C. 471, 234 S.E. 2d 720 (1977), and cases of similar import cited by Duke apposite as here the reason for rejecting the uncontradicted evidence is apparent on the face of the record.

"other factors" relevant to its fair value. In discussing that section of the former statute this Court said:

> 'Other facts' which the Commission considers in determining the 'fair value' of the utility's properties must be found and set forth in its order, so that the reviewing court may see what these elements are and determine the authority of the Commission to consider them as 'relevant to the present fair value.'

*Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 340, 189 S.E. 2d 705, 719 (1972). While that requirement of setting forth "other facts" in the Commission's order applied to another part of the statute relating to fair value of property, which has since been repealed, we believe a similar rule should apply to the requirement of the current G.S. § 62-133(d). We therefore hold that the "other material facts of record" considered by the Commission in fixing reasonable and just rates must be found and set forth in its order so that the reviewing court may see what these elements are. The Commission has done so in the record before us by explaining at some length in its final order its reasons for adopting a 14.1% rate of return on equity as opposed to the 15.0% urged by Duke's witnesses Sherwin and Grigg:

First, in its Final Order of 7 October 1980, the Commission, in supporting its determination of rate of return, noted that "at the time of the hearing in this matter, financial market conditions had shown significant improvement as indicated by a decline in interest rates and a rise in stock prices." (R. p. 272)

Second, the Commission noted that it was "certainly mindful of the benefits now inuring to Duke's debt and equity investors arising from the inclusion of CWIP in the Company's rate base and the effect which CWIP undoubtedly plays in decreasing investor risk." (R. p. 272) Pursuant to an amendment to G.S. § 62-133(b)(1), effective 1 July 1979, Construction Work in Progress (CWIP) may be included in the rate base. In this proceeding this amendment had the effect of increasing Duke's rate base by $174,218,000. (R. p. 247) This amount accounted for over 10.0% of Duke's rate base and had the effect of reducing the risk to Duke's debt and equity investors.

Third, the Commission considered "other factors" which also served "to decrease the level of risk faced by Duke's shareholders

and investors." (R. p. 272) These factors relate to the updated test year, the fuel adjustment procedure and the continued growth in Duke's electric revenues:

> For example, the legislature has provided for an updated test year which helps insulate the Company against increases in expenses occurring after the test year. Likewise, Duke enjoys the benefit of a fuel adjustment procedure which enables it to recover increases in its operating costs resulting from increases in the cost of fuel. Additionally, recent experience indicates that Duke's electric revenues have continued to grow, thereby helping to offset the effect of inflation.

(R. p. 267-268) The importance of these factors is pointed up by the Commission's reference to certain evidence appearing in the record: "Although the test year in this proceeding is the 12 months ended December 31, 1979, the Public Staff and the Company adjusted for all known changes with respect to the test year level of operating and capital costs as of April 30, 1980." (R. p. 267) The Commission also stated in its order that one of the Public Staff's witnesses states that "approximately 65% of Duke's operation and maintenance expenses are updated three times a year for increases in cost via the fuel cost adjustment procedure, leaving 35% of Duke's operating expenses subject to consideration only in a general rate case proceeding." (R. p. 267)

Fourth, the Commission included $3,200,000 in Duke's North Carolina retail rates to cover insurance premiums to Nuclear Electric Insurance, Limited (NEIL) for insurance to cover a portion of replacement power costs incurred by reason of a future unexpected extended reactor shutdown such as occurred at the Three Mile Island nuclear power station. This coverage serves to protect Duke and its customers from catastrophic loss in the event of a nuclear accident—it also serves to reduce the risk to Duke's equity investors. This was recognized in the final order of the Commission in these words: "The Commission also feels compelled to note that its approval in this Order of Duke's participation in NEIL on a trial basis further serves to lessen investor risk." (R. p. 272-273)

Fifth, the common equity component of Duke's capital structure at the close of the hearings was 35.8%. (R. p. 268) In its Find-

ing of Fact No. 13 and in its conclusions supporting that finding the Commission approved a capital structure which included a 38.0% equity ratio or an increase of 2.2% over actual which, by evidence introduced by Duke's witness Grigg, allowed Duke an additional $5,800,000 in revenue. (R. pp. 28, 237, 269) The Commission also noted in its order that this factor serves to lessen investor risk. "Similarly, the Commission believes that the capital structure set forth in Finding of Fact No. 13 above offers support to this premise." (R. p. 273)

Sixth, as elsewhere treated in this opinion with regard to the rejection of Duke's uncontradicted expert testimony as to rate of return, the Commission felt that Duke's actual experience in the increase of its return on average equity from 9.6% in 1975 to 13.1% in 1979 (based on averages as reflected in Sherwin's Exhibit I, Schedule 15) fully supported the rate of 14.1% fixed by the Commission. This actual historical return earned by Duke in those years showed significantly greater improvement in earnings than the two comparison groups used by Duke's witness Sherwin—for instance, the return on average equity for the group of 41 electric utilities (based on averages) declined from 12.0% in 1975 to 11.1% in 1979. (R. p. 274) The Commission's statement in the final order was: "In this regard the Commission strongly believes that the evidence reflected in Sherwin Exhibit I, Schedule 15, clearly supports the rate of return the Commission has hereinabove found fair." (R. p. 273)

The foregoing enumerated items fully state and explain the Commission's reasons for arriving at the fair rate of return on equity of 14.1% rather than the 15.0% urged by Duke and support the Commission's determination.

Duke's witness Grigg testified that for the twelve months ended 30 April 1980 (the date of a number of Duke's updatings from the actual test period data) Duke achieved a 13.3% return on the actual book value of common equity. (R. p. 43) This was achieved under a Commission-approved rate of 13.59% and did not reflect a full twelve months effect of a substantial increase which had been approved in October of 1979. (R. p. 113) Witness Grigg also testified that Duke's revenues were increasing substantially. (R. p. 42)

Public Staff witness Winters' Exhibit I, Schedule 1, tended to show that, if properly adjusted, the rate increase requested by Duke of $91.5 million would permit a rate of return on common equity of 17.44%.

Though we are addressing here only the rate of return on common equity which is but one component of the overall rate of return, we believe our case law addressing the overall rate of return is apposite. We have said in a number of cases that it is for the Commission, not for this Court, to determine what is a fair rate of return. *Utilities Comm. v. Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974); *Utilities Comm. v. Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974). The fixing of the rate of return by the Commission will be upheld on appeal where there is no evidence of capricious, unreasonable, or arbitrary action or disregard of law on the part of the Commission in arriving at such rate, and where the Commission's findings are supported by competent, material and substantial evidence in the record. *See Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972); *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487 (1966).

[6] We find no error in the findings or conclusions drawn by the Commission after weighing the sufficiency and credibility of the uncontradicted testimony of Duke's witnesses as to the fair rate of return. We find from the record before us that the Commission's determination of the fair rate of return is not arbitrary, capricious or unreasonable. Our review of the whole record compels the conclusion that the Commission's finding of 14.1% as a fair rate of return on common equity is indeed supported by competent material and substantial evidence.

Having determined from our review of the whole record (1) that the Commission did not err in increasing Duke's accumulated depreciation account by $3,879,000 as a corresponding adjustment to the inclusion by Duke of a *pro forma* adjustment of that same amount in its test year depreciation expense, (2) that while not required to do so the Commission stated and explained its reasons for not accepting the uncontradicted expert testimony of Duke's rate of return witnesses, and (3) that the Commission's determination that 14.1% is a fair rate of return on common equity is supported by competent, material and substantial evidence in the record, we must affirm the decision of the Court of Appeals.

Affirmed.

Justice CARLTON concurring in part, dissenting in part.

I concur with the majority in all but section III of the opinion which holds that the Utilities Commission properly increased Duke's accumulated depreciation account, thereby reducing the rate base, by the amount of $3,879,000 as an offset to an adjustment in that same amount made by Duke to reflect its probable future depreciation expense. This portion of the majority decision is, in my view, patently erroneous and I respectfully dissent therefrom. The reasoning of the majority is strained and untenable as I shall demonstrate below.

The primary reasoning of the majority, as I understand it, is that a reading of all the sections and subsections of G.S. 62-133 together justifies the Commission's action, relying on the principle that statutes *in pari materia* are to be construed together. The majority acknowledges the well-established principle of statutory construction that a statute dealing with a specific situation controls with respect to that situation, but then rejects that principle (and G.S. 62-133(b)(1) — the specific statute here involved) as being inapplicable here. The majority concludes, "the legislature intended to establish an overall scheme for fixing rates, and it must be interpreted in its entirety in order to comply with the legislative intent." With that conclusion I wholly agree. My problem is not with the principle of statutory construction relied on by the majority; it is with its application, or rather with its inconsistent application, here. This is so because after stating the broad construction approach, the majority then proceeds to pick and choose among the numerous subsections of the statute (subsections *other than* but *like* G.S. § 62-133(b)(1) dealing with *specific* matters) in determining what it considers to be the "overall scheme for ratemaking" while completely ignoring the clearest admonition found in all of the ratemaking statute — that the only depreciation to be deducted from the original cost of the utility's property is that "which has been consumed by previous use recovered by depreciation expense," G.S. § 62-133(b)(1). The majority never rationalizes its refusal to apply this clear language except to hold that when read in conjunction with other parts of the statute, this subsection does not mean what it says!

I am unable to follow this kind of reasoning. Neither the majority nor I, of course, can be certain of what the Legislature *meant* to say in the ratemaking statute. We can, however, be certain as to what the Legislature *did say*, and, given the choice, I opt to believe that it said what it meant. That a legislative body said what it meant is, I believe, the first rule of statutory construction an appellate court should apply. When the language of a statute is clear and unambiguous, an appellate court should not strain to apply other canons of statutory construction to render that statute ineffective. *Phillips v. Phillips*, 296 N.C. 590, 596, 252 S.E. 2d 761, 765 (1979). As Chief Justice Sharp stated in *Phillips*, "It is true that statutes dealing with the same subject matter must be construed together. 'When, however, the section dealing with a specific matter is clear and understandable on its face, it requires no construction.' " *Id.* (quoting *Utilities Commission v. Electric Membership Corp.*, 275 N.C. 250, 260, 166 S.E. 2d 663, 670 (1969)). I shall proceed to analyze the applicable statute with that principle foremost in mind. This, incidentally, does absolutely no violence to the "*in pari materia*" rule on which the majority relies. Indeed, it causes the correct application of that rule because, in determining the "overall scheme" for ratemaking, I shall not, as has the majority, blatantly ignore a plainly worded subsection of a statute. That is my understanding of the "*in pari materia*" rule—that *all parts* of an act should be considered, not just those parts which might lead to a desired result. By applying these rules correctly, I shall attempt to demonstrate below that the "overall scheme" established by statute did not authorize the Commission to increase Duke's accumulated depreciation beyond that actually recovered at the end of the test year and, hence, that the Commission improperly reduced the rate base.

While there are several positions taken by the majority with which I disagree, as noted below, its most serious error in determining the "overall scheme" from our statute, in my view, is its failure to understand the *bifocal thrust* of G.S. 62-133. The statute is not, as the majority apparently believes, limited to a single time factor for rate determination. *Two separate factors*, an understanding of which is absolutely critical to the issue here posited, is clearly contemplated by the statute.

The critical point I wish to make can best be explained by first summarizing the ratemaking procedure provided by G.S.

62-133. I am the first to concede that this statute is disjointed, somewhat inartfully drawn and confusing. Careful analysis, however, reveals that the Legislature provided a methodical scheme of ratemaking.

The first point to be made is that G.S. 62-133 contemplates that the fixing of rates to be charged by a public utility is based on *two separate factors*. The failure of the majority to recognize this critical dichotomy leads, I think, to the majority's failure to understand the two factors contemplated by the statute and how those factors affect the rate determination. The two factors which must be determined in order properly to fix rates are (1) the rate base, and (2) the utility's probable *future* expenses. These factors differ both in terms of the type of data making up each and in terms of the relevant time at which each is measured. The majority opinion completely confuses the time periods and, thus, treats the entire ratemaking process as if only the test year period were involved. Again, failure to understand the bifocal nature of rate determination leads to the misunderstanding that only one time period is involved. The following brief summary of the statute will, I believe, confirm this conclusion.

For the purpose of the question presented by this appeal, the following is an accurate summary of the relevant provisions of G.S. 62-133, the ratemaking statute.

The Commission, as a first step in setting rates, must ascertain the rate base. This is done by determining the reasonable original cost of the public utility's property in service *as of the end of the test period*. From that amount is subtracted accumulated depreciation *"which has been consumed by previous use recovered by depreciation expense."* To this amount is added the reasonable original cost of investment in plant under construction. *The resulting figure is the rate base.* G.S. 162-133(b)(1). Thus, the rate base factor involves data concerning unrecovered cost of property as of the *end of the test period*. The rate base, which for convenience I shall call Factor 1, is then multiplied by what the Commission has determined to be a fair rate of return and the product represents a fair return on the property in service at the end of the period. The time frame for the computation of Factor 1, the rate base, is "the end of the test period," as provided in both G.S. 62-133(b)(1) and G.S. 62-133(c). The sole excep-

tion, also provided by subsection (c), is that in determining the rate base the Commission shall consider evidence of actual cost changes based upon circumstances and events occurring *after* the test period but before the hearing. This exception has no application in the case before us. The events and occurrences which led to the depreciation adjustments in question here took place only *during* the test period itself.

The second factor to be determined is that of the utility's probable *future* operating expenses. This figure is then added to the product of the rate of return and the rate base in order to fix the appropriate and lawful rates to be charged by the utility. This second factor, however, involves separate accounting data and has a timing consideration different from that of the rate base. As stated above, the rate base is determined as of the end of the test period based on events *which have already occurred* and, in this sense, is a *fait accompli.* The expenses making up the second factor, however, are those likely to occur in the *future* and involve an estimation. This estimation of probable future expenses is based on the level of plant in service at the end of the test period. While Factor 2 relies on the level of plant in service as established by Factor 1 for its estimation, the two factors encompass two entirely different periods of time. The first factor looks to the *past*, the second to the *future*.

The statutory dichotomy is thus clear; the first factor, the rate base, concerns the original cost of the plant in service at the *end* of the test year (events which have already occurred); the second, the probable *future* expenses (*projections* based on the level of plant in service at the end of the test year). When Factor 1 (rate base) is multiplied by the rate of return and that product is added to Factor 2 (future expenses), their sum represents the level of revenue deemed adequate by the Commission to pay the utility's reasonable operating expenses and to give its investors a fair return on their investment. This sum is the amount of revenue the utility will receive through sale of its services. In tabular form, I would summarize the ratemaking procedures *as it applies to this case*[1] thusly:

---

1. Again, it must be noted that although G.S. 62-133(c) allows adjustments to the rate base for actual changes in cost occurring after the close of the test year, that subsection is inapplicable to this case. The formula set forth in this opinion is for those cases in which no adjustments are made for events occurring after the test year.

Utilities Commission v. Duke Power Co.

STATUTORY FORMULA

(Factor 1 × Rate of Return) + Factor 2 = Revenues to be earned through charges for utility's service

Factor 1 (Rate Base) = Original cost of plant in service at end of test year

less: accumulated depreciation "which has been consumed by previous use recovered by depreciation expense"

plus: reasonable original cost of plant under construction.

Factor 2 = Probable *future* expenses based on level of plant and equipment in operation at the end of the test period.

THE STATUTORY TIME FRAME

For Factor 1

End of the test period (except for adjustments for events occurring *after* test period as allowed by G.S. 62-133(c)).

For Factor 2

Determine probable *future* expenses based on the plant and equipment in service at the end of the test period.

Applying the foregoing to the record before us, I think the Commission erred at one crucial point in the ratemaking process. In its application, Duke properly submitted a figure representing the original cost of its plant in service on 31 December 1979, the end of the test period. Subtracted from this figure is the amount of accumulated depreciation reserve on the utility's books at the close of the test period. The accumulated depreciation reserve is the book entry representing property "which has been consumed by previous use recovered by depreciation expense" as of the end of the test period, the precise computation prescribed by G.S. 62-133(b)(1). Duke also submitted a figure representing its probable *future* (*not test period*) depreciation expense based on the plant and equipment in service at the end of the test period.[2] The

___

2. The majority's assertion that Duke made a *pro forma* adjustment to its test year depreciation expense is incorrect; this figure represents probable *future* expenses.

Commission, however, subtracted not only the accumulated depreciation on Duke's books as of the end of the test period but also the sum of $3,879,000 (the same amount as Duke's estimation of its *future* depreciation expense) as a *pro forma* adjustment to the accumulated depreciation for the test year. As I understand it, the Commission's reasoning is that it regards the *pro forma* adjustment to accumulated depreciation to be a necessary accounting corollary to the *pro forma* adjustment which Duke made for future depreciation expense. (This figure represents what the depreciation expense for the full year would have been had the depreciated property in question been in service throughout the year. It had actually come into service at various times throughout the year.) The Commission acknowledged that the additional $3,879,000 added to the accumulated depreciation, thereby reducing the rate base, "ha[d] not been collected from the company's customers." The Commission also stated in its order that it was relying on its precedent in a previous rate proceeding. The Commission concluded that the adjustment to the rate base achieved "a proper and equitable matching of revenues and costs." In so acting, I believe the Commission committed serious error.

As explained above, I think the majority's error in affirming the Commission's action results from its failure to understand the different factors established by our statute and the relevant time frames encompassed by those factors. G.S. 62-133(b)(1) is plain and unambiguous: it requires that the rate base (Factor 1) be based on plant in service at the end of the test period, less only that depreciation which represents cost previously consumed and recovered by depreciation expense. The Commission violated this portion of the statute here by subtracting from the company's original plant cost accumulated depreciation which had not been consumed and recovered by depreciation expense as of the end of the test period. Duke, however, was entitled to the additional depreciation expense by way of an adjustment under Factor 2 because that factor is based on an entirely different time frame — the projection of probable future expenses (including, of course, depreciation expense).

This Court has spoken to this issue before. In *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 327, 230 S.E. 2d 651 (1976), it was said:

Apparently the Attorney General is arguing that the Commission must assume the utility's operating expenses will remain the same as they were during the test period in setting rates for some future period. This is not the law. Rate schedules are set with an eye no less toward the future than to the past. General Statutes 62-133(b)(2), (b)(3) and (c) contemplate that the Commission will consider "probable future revenues and expenses" in setting rates for the future. "Obviously, conditions do not remain static." . . . The company's experience during the test period regarding revenues produced and operating expenses incurred "is the basis for a reasonably accurate estimate of what may be anticipated in the near future if, but only if, appropriate *pro forma* adjustments are made for abnormalities which existed in the test period and for changes in conditions occurring during the test period. . . ." . . . *Estimates regarding probable future revenues and expenses, however, must be based upon the utility's plant and equipment actually in operation at the end of the test period.*

291 N.C. at 342, 230 S.E. 2d at 660 (emphasis added) (citations omitted).

The Commission's action here, condoned by the majority, plainly violates the underlined portion above. This is so because of the requirement that estimates regarding probable future revenues and expenses must be based upon the utility's plant and equipment actually in operation at the end of the test period. Here, by reducing the rate base through the *pro forma* adjustment to accumulated depreciation, the result is to produce a smaller net plant in service than that "actually in operation at the end of the test period."

The majority stresses that G.S. 62-133(b)(1) must be read in conjunction with G.S. 62-133(c). The view taken in this dissent does indeed read these statutes in conjunction with one another. *Both* clearly provide that the *original cost* of a public utility's property is to be determined as of the end of the test period and provide no support for the Commission's action.

Nor am I able to find any support for the Commission's action in G.S. 62-133(d), which allows the Commission to consider "all other material facts of record that will enable it to determine

what are just and reasonable rates." This provision, in my opinion, is a catch-all intended to cover unusual situations which may arise in future rate cases and are too numerous and too complex to be dealt with by legislation. Depreciation expense is not such an "unusual situation." Utilities will always have probable future depreciation expense, and most plants do not initially come into service on January 1. I believe that the Legislature fully and explicitly dealt with the situation of a plant's coming into service in mid-year with G.S. 62-133(b)(1) and (c). These subsections make clear the time frames within which the rate base and expense components are to be measured. I cannot believe that the Legislature relegated the treatment of such a common situation to a general catch-all provision.

When adjustments are made within the test period, as here, the applicable portion of G.S. 62-133 is that referring to "probable future revenues and expenses." And, the first sentence of the statute clearly provides that these probable future expenses shall be based on plant and equipment in operation *at the end of the test period*. On this point, the statute is about as clear and unambiguous as it could possibly be.

I might add also that this view of the statute seems appropriate to me from an economic standpoint as well. As stated in J. Bonbright, *Principles of Public Utility Rates* 197 (1961):

What [the accumulated depreciation reserve] represents is the amortized costs of the assets in the sense of that part of the costs which has already been charged, or which should have been charged, to previous periods of operation. "Cost minus depreciation" is therefore a shorthand expression for costs remaining to be amortized by future charges to operation and hence indirectly by future charges against the consumers of public utility service.

In other words, the purpose of the depreciation reserve in utility regulation, as I understand it, is to recognize that amount of the cost of plant which has already been recovered through rates. This Court acknowledged this principle in *State ex rel. Utilities Commission v. Heater Utilities, Inc.*, 288 N.C. 457, 219 S.E. 2d 56 (1975). Based on this understanding of the purpose of an accumulated depreciation reserve, it obviously follows that when a *pro forma* adjustment is made to that reserve to reflect

something which has *not* been recovered through previous rates, then the utility will never recover depreciation on that increment and the rates are, therefore, deficient under our statute.

This Court has decided numerous cases which hold that the Commission is not free to devise its own principles of ratemaking but must comply with the requirements of Chapter 62 of our General Statutes. *E.g., State ex rel. Utilities Commission v. Duke Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974). Moreover, a ratemaking practice of the Commission, even one which it has followed for many years (as I suspect is the case here) and is commonly accepted in other jurisdictions, is unlawful if contrary to G.S. 62-133(b)(1). I would also add that my reading of the appellee's brief compels the conclusion that the Commission has taken the action in question here primarily on the basis of what it considers to be a fundamental accounting principle, that of double entry bookkeeping. While the Commission's action may accord with sound accounting principles, it does not necessarily follow that those accounting principles apply to ratemaking. Ratemaking is a statutory matter; in setting up a ratemaking procedure our Legislature is free to adopt any process it so chooses, even one which does not follow accounting principles. I believe it has done so here. While accounting principles may be helpful in ratemaking, they do not control the process.

I wish also to make these additional observations:

(1) The majority devotes several pages to explaining that various subsections of G.S. 62-133 must be' read in conjunction with one another. As noted above, I agree that the subsections of a statute should be construed together. Duke itself does not contest this canon of statutory construction. The majority's lengthy discourse lends absolutely no support to the majority's ultimate conclusion that the Commission's *pro forma* offset to accumulated depreciation "should be made."

(2) I also think it worthwhile to note that the majority further strains to rationalize its decision by quoting at length from Public Staff Witness Winters' testimony. Mr. Winters testified as to the Public Staff's reasoning behind seeking the offset to accumulated depreciation. After giving extensive excerpts from Winters' testimony on this point, the majority simply states, "We find that the Commission was fully justified in that conclusion."

I find it a novel approach to judicial decision-making to rely on the testimony of a witness to determine whether the action of an administrative agency is affected by error of law. It was my understanding, apparently mistaken, that questions of law were matters for the courts and not for a witness's speculation.

(3) Without any real explanation, the majority opinion also notes that to hold in favor of Duke concerning the issue before us would result in rates which would yield a "windfall" to Duke at the expense of the ratepayers. In this instance, any resulting unfairness is to Duke, not the ratepayers. This is so first because the depreciation expense definitely will be incurred by Duke. This is acknowledged by the Commission itself. It seems logical to me that, without the adjustment for future expenses, the expenses would be understated and the rates therefore deficient. An analogous situation would be an increase in wage rates. Should employee wages be increased during the test period, obviously the higher wages being paid at the end of the test period must be considered in predicting probable revenues and expenses for the future even though they were not paid throughout the test period.

The rate base, on the other hand, must include all property serving the public and should not be artificially reduced. When the rate base is decreased by adjusting the accumulated depreciation by an amount which exceeds that recorded on the company's books, the company will not earn the fair rate of return on its total plant. I simply find no logic or fairness in the position that the rate base should be reduced by taking depreciation on utility property which has not yet occurred at the end of the test period when our statute clearly provides that the rate base is supposed to be figured on the basis of that precise point in time.

When G.S. 62-133 is correctly understood as explained above and in light of the completely unambiguous language of G.S. 62-133(b)(1), it is crystal clear that the Commission erred as a matter of law in making the *pro forma* offset. Indeed, without quarreling with the majority as to the appropriate standard of review, I believe the Commission *exceeded* its statutory authority in violation of G.S. 62-94(c)(2). This is so because *with respect to the rate base* I find absolutely no authority in our statutes to make *pro forma* adjustments to the rate base for events occurring

within the test period. In this connection, the plant is to be considered as it actually existed at the end of the test period.

In fairness to the majority, I must confess that my initial study of the briefs submitted led me to the same conclusion which it has reached. I was persuaded at that time by the very appealing argument that normal accounting practices would call for the offset ordered by the Commission. Having now determined, after painstaking study of the statute, that the Legislature had a different methodology for ratemaking in mind, as explained above, I must respectfully dissent. The methodology for ratemaking is the prerogative of the Legislature, not that of the Commission or this Court.

For the reasons stated above, I vote to reverse the Court of Appeals' decision on the point here discussed. The case should be remanded to that court with instructions that it remand to the Utilities Commission with directions that it recompute the rates after removing the *pro forma* adjustment for accumulated depreciation.

Chief Justice BRANCH and Justice EXUM join in this dissenting opinion.

