RICHARD E. WATSON v. NORTH CAROLINA REAL ESTATE COMMISSION

No. 8610SC1287

(Filed 1 December 1987)

1. **Brokers and Factors § 8— revocation of real estate license—sufficiency of evidence to support findings of fact**

   In a proceeding for revocation of petitioner's real estate license findings of fact by respondent Commission were supported by substantial evidence, and those findings were sufficient to support its conclusions of law that petitioner engaged in improper and dishonest dealing with regard to using altered tape recordings at the hearing; he falsely promised to buyers that their contract was terminated and that they would receive earnest money; he engaged in improper, fraudulent, and dishonest dealing by arranging for a city inspection and using it to attempt to coerce the buyers into closing a transaction; and he made a wilful misrepresentation to buyers that nothing was wrong with the house in question. N.C.G.S. § 93A-6(a)(1), (2), (8) and (10).

2. **Brokers and Factors § 8— revocation of real estate license—adequate notice of hearing**

   In a proceeding for revocation of petitioner's real estate license, there was no merit to petitioner's contention that he did not receive adequate notice of the hearings before respondent Commission and the order of the Commission was therefore based on "unlawful procedure," since petitioner received two notices which advised him of the date, hour, place, and nature of the hearings,

made particular reference to the sections of the statute involved, and set forth a short and plain statement of the factual allegations. N.C.G.S. § 150A-23(b).

**3. Brokers and Factors § 8 — revocation of real estate license — allegedly improper actions unrelated to real estate selling**

Respondent Commission could properly find that petitioner's knowingly permitting the use of altered tape recordings in his Commission hearing violated N.C.G.S. § 93A-6(a)(8) and (10), since it was not required that the activities giving rise to a suspension or revocation be directly related to real estate brokering or selling.

APPEAL by respondent North Carolina Real Estate Commission from *Farmer, Judge.* Order entered in Superior Court, WAKE County. Heard in the Court of Appeals 7 May 1987.

*Satisky and Silverstein, by John M. Silverstein, for petitioner-appellee.*

*Erdman, Boggs & Harkins, by Harry H. Harkins Jr., for respondent-appellant.*

GREENE, Judge.

Defendant Watson (hereinafter, "Watson") was a licensed real estate broker. Norman and Elizabeth Stewart (hereinafter sometimes collectively called "buyers") filed a complaint against Watson with the North Carolina Real Estate Commission (hereinafter, the "Commission"). The Commission filed a notice of hearing under N.C.G.S. Sec 150A-23 (1983) charging Watson with certain violations of N.C.G.S. Sec. 93A-6 (1983). After the first hearing was adjourned, the Commission served Watson with a second notice alleging additional violations. After the hearings were completed, the Commission found Watson had violated various provisions of Section 93A-6 and revoked his real estate license. On appeal, the superior court reversed the Commission's order. The Commission appeals.

As this case commenced before 1 January 1986, the scope of our review is determined by former N.C.G.S. Sec. 150A-51 (now codified as N.C.G.S. Sec. 150B-51 (Cum. Supp. 1985)) which provided:

The court may . . . reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions,

or decisions are: (1) in violation of constitutional provisions; or (2) in excess of the statutory authority or jurisdiction of the agency; or (3) made upon unlawful procedures; or (4) affected by other error of law; or (5) unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or (6) arbitrary or capricious.

Review in this court is further limited to the exceptions and assignments of error set forth to the order of the superior court. N.C.G.S. Sec. 150A-52 (1983); N.C.R. App. P. 10(a); *see O.S. Steel Erectors v. Brooks*, 84 N.C. App. 630, 632, 353 S.E. 2d 869, 872 (1987).

---

The following issues are presented: I) in view of the entire record under Section 150A-51(5), whether substantial evidence supported (A) the Commission's Findings of Fact and (B) the Commission's Conclusions of Law; II) whether (A) Watson received adequate notice of the Commission's charges under Section 150A-23(b) or (B) whether the Commission's grounds for revocation fatally varied from the charges set forth by the notice; III) whether Watson's use of certain tape recordings before the Commission constituted a violation of Section 93A-6(a)(8) or Section 93A-6(a)(10); and IV) whether the Commission's determination of Watson's violations and revocation of his license were arbitrary and capricious.

I

Under Section 150A-51(5), we apply the "whole record" test in determining whether the Commission's findings and conclusions are supported by substantial evidence:

The 'whole record' test does not permit the reviewing court to substitute its judgment for the agency's as between two reasonably conflicting views; however, it does require the court to take into account both the evidence justifying the agency's decision and the contradictory evidence from which a different result could be reached. . . . 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' . . . It is more than a scintilla or a permissible inference.

*Lackey v. N.C. Dept. of Human Resources,* 306 N.C. 231, 238, 293 S.E. 2d 171, 176 (1982) (citation omitted); *see also* 2 C. Koch *Administrative Law and Practice* Sec. 9.4 (1985) (characterizing "substantial evidence" standard as "reasonableness" review). While our review is limited to assignments of error to the superior court's order, this court is not required to accord any particular deference to the superior court's findings and conclusions concerning the Commission's actions. *See* 2 C. Koch *Administrative Law and Practice* Sec. 8.54 at 82. However, the "whole record" standard of review is not intended to encourage "judicial duplication" of administrative decision-making. *Id.,* Sec. 9.4 at 92.

## A

[1]    Without any discussion whatsoever, the superior court concluded that none of the Commission's twenty findings of fact were supported by substantial evidence. Such a "broadside" conclusion is of little aid to this court and subverts the intent of Section 150A-51 which specifically requires the court to set out its reasons for reversing or modifying the Commission's decision. However, we have reviewed the entire record and find all twenty findings are supported by substantial evidence. Specifically, we find no evidence in the record that would contradict Findings of Fact Nos. 1-8. The record does evidence some dispute concerning the remaining findings.

### Finding of Fact No. 9

> (9) Respondent then told the [buyers] that the "deal was dead" and the contract would be terminated. When the Stewarts inquired about the return of their earnest money, Respondent promised them he would return it upon receipt of a letter from their bank certifying that their check had cleared.

Norman Stewart specifically testified that Watson told him the "deal was dead and the contract terminated" and that the earnest money would be returned as soon as the check cleared the bank. Testifying to the contrary, Watson stated he told Stewart that, if the seller failed to make certain requested repairs, Stewart "might be entitled to get out of the contract" and might also be entitled to a refund of the $500 deposit. Despite Watson's somewhat contradictory statement, we find substantial evidence supported this particular finding.

Findings of Fact Nos. 11-16

(11) The Stewarts obtained a letter from their bank. They attempted to call Respondent for two days, but he refused to return their phone calls. When the Stewarts finally reached Respondent on the evening of July 22, 1982, he told them the property had been reinspected, was in good repair, that there was nothing wrong with the house, and that the "deal was on." In subsequent conversations, he further told them that Mr. Gaddy was a liar and a cheat, and threatened them with litigation if they did not go ahead with the purchase.

(12) Respondent contacted the High Point Inspections Department and asked for a letter stating the property was in good condition. He requested the acting Director of Inspections, Julius Lambeth, to certify the property was in good condition without inspecting the property. Mr. Lambeth refused to so certify without an inspection. The city inspections were limited to determining if utilities were currently working, and were not as extensive as Mr. Gaddy's.

(13) The High Point Inspections Department determined that although the plumbing worked, it was not in compliance with the new building code. The city merely certified that the property was fit for human habitation. Although the city reported the heating system currently worked, it did not determine if the heat exchanger was cracked.

(14) The High Point Inspection Department refused to give Respondent a letter stating everything was in good working order. The city did provide a letter stating the plumbing worked "at this time."

(15) Respondent failed to disclose to the sellers, Mr. and Mrs. Lambeth, that their plumbing did not comply with the new building code. Instead, he falsely told them that all the utilities in their house had passed inspection. Based on Respondent's representations and failures to disclose to the Lambeths, they refused to authorize the return of the Stewarts' earnest money.

(16) Respondent's attempts to get the city to certify the property was in good working order was for the purpose of

discrediting Mr. Gaddy's report and to force the Stewarts to close the transaction, after he had already promised them the "deal was dead" and they would receive their earnest money.

Evidence supporting Findings Nos. 11-16 came from various sources. The High Point Director of Inspections testified Watson requested he issue a "certificate of inspection" without inspecting the property. The Inspections Department did determine the plumbing "worked," but also determined it did not comply with the building code. A city building inspector testified he could not determine if the heat exchanger was cracked without taking it apart; he also stated the city could only determine if the device was in good working order as of the time of inspection. The seller testified Watson never told her the plumbing did not meet the current building code requirements. Gaddy, an inspector employed by the buyer, testified the plumbing was inadequate and the heat exchanger might be cracked.

Watson testified he told Norman Stewart that the plumbing did not meet code specifications but was in good working order. He further testified he told Stewart that the furnace had been inspected by the city and was found to be in good working order. Watson denied asking for a city certification without an inspection.

In resolving this conflicting evidence, the credibility of the witnesses was obviously an issue. The Commission apparently chose not to believe Watson and that is within its discretion. *See State ex rel. Util. Comm'n v. Duke Power Co.*, 305 N.C. 1, 21, 287 S.E. 2d 786, 798-99 (1982). We find substantial evidence supported Findings of Fact Nos. 11-16.

### Findings of Fact Nos. 17-20

(17) On September 29, 1983, at the first hearing in this proceeding, Respondent, in the physical presence of the Commission, handed his attorney two cassette tapes purporting to be recordings of telephone conversations between Respondent and Mr. Stewart and Mr. Julius Lambeth. The tapes were made without the knowledge or consent of either Mr. Stewart or Mr. Julius Lambeth.

(18) Respondent gave the tapes to his attorney to be used in the cross-examination of Mr. Stewart and Mr. Julius

Lambeth. The tapes were so used, in that Respondent and his attorney personally played them in the presence of the Commission during such cross examination.

(19) The tapes were not accurate depictions of the conversations between Respondent and Mr. Stewart and Mr. Julius Lambeth. Rather, portions of the conversations were deleted, and Respondent inserted information into the recordings that were not part of the original conversations. This finding is based on the testimony of Mr. Stewart and Mr. Julius Lambeth, and the results of an analysis of the tapes conducted by the Federal Bureau of Investigation.

(20) Respondent deliberately caused "doctored" tapes that were not accurate recordings of the conversations to be played before the Commission in an attempt to deceive the Commission.

The evidence supporting these findings comes from several witnesses, including Watson himself. Watson testified he permitted the tapes to be played before the Commission; Watson actually placed the tapes into the recorder and later removed them. The persons whose conversations were allegedly taped testified the recordings were made without their knowledge or consent. The record clearly reveals the tapes were used in the cross-examination of both the buyer and the city inspector. Both the buyer and the city inspector testified the recordings of their respective conversations with Watson did not properly reflect those conversations. They both testified that either portions of the conversations had been deleted or certain additional conversation had been inserted. A tape recording expert with the Federal Bureau of Investigation testified the tape of Watson's conversation with the buyer contained information which was "not part of the conversation as originally recorded and was subsequently inserted." The agent further stated the tape of Watson's conversation with the city inspector contained several lines which were repeated a second time on the same recording; however, the expert stated he could not definitely say that this latter tape recording had been altered.

Watson testified that no extraneous matter had been inserted on two of the tapes and that the tapes were not "doctored." He admitted taping the conversations and argued any

appearance of a "doctored" tape occurred when he dropped the recording device while taping one of the conversations. He further stated the original tapes had been destroyed and the tapes analyzed for the Commission were actually recordings of the original tapes. While Watson denied altering the tapes and offered some explanations for any appearance of altered tapes, the agency obviously did not find the explanations believable, particularly in light of the expert testimony. We therefore find substantial evidence to support these findings.

B

The Commission next assigns as error the trial court's findings that the Commission's Conclusions of Law are not supported by substantial evidence. The Commission entered the following conclusions:

(1) Respondent is adjudged guilty of violating GS 93A-6 (a)(10) by engaging in improper and dishonest dealing for his conduct with regard to the altered tapes.

(2) Respondent is adjudged guilty of violating GS 93A-6 (a)(8) as being unworthy to act as a real estate broker in a manner that endangers the public interest, for his conduct with regard to the altered tapes.

(3) Respondent is adjudged guilty of violating GS 93A-6 (a)(2) by falsely promising to the Stewarts that their contract was terminated and they would receive their earnest money.

(4) Respondent is adjudged guilty of violating GS 93A-6 (a)(10) by engaging in improper, fraudulent and dishonest dealing for his conduct in arranging for the High Point city inspection, using such inspection to attempt to coerce the Stewarts into closing the transaction, and failing to disclose the true facts to the sellers.

(5) Respondent is adjudged guilty of violating GS 93A-6 (a)(1) by making a willful misrepresentation to the Stewarts that nothing was wrong with the house.

We find these conclusions are supported by those findings we have previously found were supported by substantial evidence. Specifically, Conclusions of Law Nos. 1 and 2 are supported by Findings of Fact Nos. 17 through 20. Conclusion of Law No. 3 is

supported by Findings of Fact Nos. 9 and 10. Conclusion of Law No. 4 is supported by Findings of Fact Nos. 11 through 16. Conclusion of Law No. 5 is supported by Finding of Fact No. 16.

## II

[2]   The Commission next assigns error to the trial court's finding that the Commission's Conclusions of Law Nos. 1 and 2 were entered upon unlawful procedure. Watson had argued before the superior court that he did not receive adequate notice of the hearing under N.C.G.S. Sec. 150A-23(b) and therefore the order of the Commission was based on "unlawful procedure" under N.C.G.S. Sec. 150A-51(3). N.C.G.S. Sec. 150A-23(b) provides:

> The parties shall be given a reasonable notice of the hearing, which notice shall include: (1) a statement of the date, hour, place and nature of the hearing; (2) a reference to the particular sections of the statutes and rules involved; and (3) a short and plain statement of the factual allegations.

## A

Watson was given two separate notices. The first notice informed Watson a hearing was scheduled before the North Carolina Real Estate Licensing Board on seventeen different specific allegations. The notice further stated if the allegations were found to be true, they "may warrant the suspension or revocation of your real estate broker's license, pursuant to G.S. 93A-6(a)(1), (2), (8) and (10)." The second notice additionally informed Watson the Commission intended to present evidence that he had:

> handed [his] attorney certain tapes purporting to be tape recordings . . . which said tapes were intended to be used, and in fact were used as evidence in [his] defense in this case. The Commission will also present evidence which tends to show that said tape recordings were not genuine recordings . . . and that [he] attempted to deceive the Commission by presenting false or doctored evidence.

The notice further informed Watson that, if true, the conduct violated "G.S. 93A-6(a)(8) and (10)."

In *Parrish v. North Carolina Real Estate Licensing Bd.*, 41 N.C. App. 102, 105, 254 S.E. 2d 268, 270 (1979), we held the notice must "charge the offense with sufficient certainty to apprise the

defendant of the specific accusation against him so as to enable him to prepare his defense . . . ." *See also Edwards v. Latham,* 60 N.C. App. 759, 762, 299 S.E. 2d 819, 821 (1983). Under *Parrish* and *Edwards,* the notice in this case fully complied with Section 150A-23(b). The notices advised Watson of the date, hour, place and nature of the hearings and made particular reference to the sections of the statute involved. Furthermore, a short and plain statement of the factual allegations was contained in the notice sufficient to enable him to prepare his defense.

B

The notice served on Watson stated the Commission would present evidence that Watson had used the tapes "as evidence in your defense." Watson argues he did not use the tapes as evidence in his defense, but only attempted to use them to cross-examine witnesses. In attempting to use the tapes to cross-examine witnesses, Watson did use the tapes in defending himself before the Commission. We find any variance between the notice and proof to be insignificant. In a criminal case, the purpose of the rule as to variance between indictment and proof "is to avoid surprise . . . and the discrepancy must not be used to ensnare the defendant or to deprive him of an opportunity to present his defense." *State v. Guffey,* 39 N.C. App. 359, 362, 250 S.E. 2d 96, 98 (1979) (citation omitted). The same rationale is applicable in proceedings pursuant to N.C.G.S. Sec. 150A-23. *Parrish,* 41 N.C. App. at 105, 254 S.E. 2d at 270. We do not find Watson was surprised nor was any discrepancy used to ensnare Watson or deprive him of an opportunity to present his defense.

We therefore reject both of Watson's arguments and conclude the Commission did not proceed under any unlawful procedure under Section 150A-51(3).

III

[3] The Commission next assigns error to the superior court's findings that the Commission's Conclusions of Law Nos. 1 and 2 exceeded the Commission's statutory authority. The Commission concluded Watson's use of the tapes violated N.C.G.S. Sec. 93A-6(a)(8), (10) which prohibits:

(8) Being unworthy or incompetent to act as a real estate broker or salesman in a manner as to endanger the interest of the public; [or]

(10) Any other conduct which constitutes improper, fraudulent or dishonest dealing.

The superior court specifically found the "disciplinary authority of the agency does not extend to conduct by petitioner's counsel in playing tapes during cross-examination of prosecution witnesses. The 'conduct' does not involve petitioner's actions as a broker."

In support of the lower court, Watson argues his conduct regarding the tapes does not authorize the Commission to revoke his license under the holding of *In re Dillingham*, 257 N.C. 684, 127 S.E. 2d 584 (1962). In *Dillingham*, a licensed real estate broker had pleaded guilty to a charge of operating a disorderly house. By virtue of this guilty plea in another proceeding, the Board found the broker was likewise guilty of violating several provisions of Section 93A-6. Specifically focusing on the "unworthy or incompetent" provision, the Supreme Court held the broker's operation of a disorderly house in violation of a criminal statute was not an action "connected in any way with the pursuit of his licensed privilege as a real estate broker" and was not therefore ground for revoking his license. *Dillingham*, 257 N.C. at 695, 127 S.E. 2d at 592.

The version of Section 93A-6 applicable to the present case substantially differs from the version in effect at the time of *Dillingham*. That earlier version provided in pertinent part:

The Board . . . shall . . . have power to suspend or revoke any license issued under the provisions of this Chapter . . . *where the licensee in performing or attempting to perform any of the acts mentioned herein* is deemed to be guilty of: . . . (8) being unworthy or incompetent to act as a real estate broker or salesman in such manner as to safeguard the interest of the public. [Emphasis added.]

The version of Section 93A-6(a) in effect at the time of Watson's hearing and now in  effect omits the condition emphasized above and simply states in part:

The Commission shall have power to suspend or revoke at any time a license issued under the provisions of this Chapter, . . . if, . . . the Commission adjudges the licensee to be guilty of: . . . (8) being unworthy or incompetent to act as a real estate broker or salesman in a manner as to endanger the interest of the public; . . . (10) any other conduct which constitutes improper, fraudulent or dishonest dealing.

In *Dillingham*, the Court found the words "any of the acts mentioned herein" must mean "the acts of a real estate broker or real estate salesman *for which a license is required* . . . ." *Dillingham*, 257 N.C. at 694, 127 S.E. 2d at 591 (emphasis added). A license is required in order to sell or offer to sell, buy or offer to buy any real estate. N.C.G.S. Sec. 93A-2. That the current statute omits the words "any of the acts mentioned herein" is significant: unless the specific provision provides otherwise, the amended statute permits the Commission to suspend or revoke a license issued pursuant to N.C.G.S. Sec. 93A-4 for any of the acts enumerated in N.C.G.S. Sec. 93A-6(a)1-12 without regard to whether the acts were connected in any way with the pursuit of the licensed privilege of a real estate broker or salesman.

In determining legislative intent, it is appropriate to assume the legislature is aware of any judicial construction of a statute. *See* 73 Am. Jur. 2d, *Statutes* Sec. 164 at 368 (1974). That the legislature chose to omit the language on which *Dillingham* relied shows the clear intent to omit the requirement that the activities giving rise to a suspension or revocation must be directly related to real estate brokering or selling. We therefore conclude the amendment of Section 93A-6 evidences the legislature's clear intent to remove the requirements placed on the earlier version of the statute by *Dillingham*. Therefore, we hold the Commission could find Watson's knowingly permitting the use of altered tapes in his Commission hearing violated Sections 93A-6(a)(8) and (10). Consequently, the Commission's order was not affected by any error of law.

IV

The Commission finally assigns error to the superior court's conclusion that the Commission's Conclusions of Law Nos. 3 and 4 were "arbitrary and capricious." Conclusion No. 3 adjudged Watson guilty of violating Section 93A-6(a)(2) "by falsely promising to

the Stewarts that their contract was terminated and they would receive their earnest money." Conclusion No. 4 adjudged Watson guilty of violating Section 93A-6(a)(10) in arranging the city inspection, using such inspection to attempt to coerce the buyers into closing the transaction and for failing to disclose the true facts to the sellers. We find no merit in the superior court's reasoning that these conclusions were arbitrary and capricious. First, the Commission found Watson guilty because he falsely *promised* to return the earnest money, not because he failed to return the money. Second, Watson had ample notice he was charged with fraud.

The superior court also found the Commission's action was arbitrary and capricious because the punishment was too harsh. We note the punishment was within the limits allowed by the statute. Sec. 93A-6(a). Furthermore, agency action is considered "arbitrary and capricious" only if it indicates "a lack of fair and careful consideration" and fails "to indicate 'any course of reasoning and the exercise of judgment.'" *State ex rel. Comm'r of Ins. v. North Carolina Rate Bureau*, 300 N.C. 381, 420, 269 S.E. 2d 547, 573 (1980). The Commission's revocation does not evidence any lack of fairness or careful consideration.

V

We find the Commission's revocation of Watson's license was supported by substantial, competent and material evidence, was conducted under lawful procedure, was unaffected by error of law and was not arbitrary or capricious. The judgment of the superior court reversing the order revoking Watson's license is therefore

Reversed.

Judges PHILLIPS and COZORT concur.